**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | | |
|---|---|---|
| Richard Alexander Murdaugh, Sr., | ) | Civ. No. __2:26-1989-CMC__ |
| | ) | |
| Plaintiff, | ) | |
| | ) | **COMPLAINT** |
| v. | ) | |
| | ) | |
| Rebecca Hill, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

Plaintiff Richard Alexander "Alex" Murdaugh, through his undersigned attorneys, brings this civil rights action against Defendant Rebecca "Becky" Hill, formerly the Clerk of Court for Colleton County, South Carolina, and would respectfully show this Court the following:

## NATURE OF THE ACTION

1.     This is a civil rights action pursuant to 42 U.S.C. § 1983 against Defendant Becky Hill, former Clerk of Court for Colleton County, South Carolina, for the deliberate and egregious deprivation of Plaintiff's constitutional right to a fair trial before an impartial jury, guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution.

2.     "No right touches more the heart of fairness in a trial" than the right to an impartial jury. *Barnes v. Joyner*, 751 F.3d 229, 240 (4th Cir. 2014). That right was stolen from Alex Murdaugh by Becky Hill.

3.     On March 7, 2023, following a six-week trial in Colleton County, South Carolina, Mr. Murdaugh was convicted of the murders of his wife, Margaret "Maggie" Murdaugh, and his son, Paul Murdaugh. He was sentenced to two consecutive life terms. He maintained his innocence then. He maintains his innocence now.

-1-

4.     Neither Mr. Murdaugh nor his counsel knew at the time of trial that Ms. Hill— the elected Clerk of Court for Colleton County, the officer of the court charged as the primary caretaker of the jury—had secretly and deliberately inserted herself into the jury's deliberative process for personal financial gain.  As the Supreme Court of South Carolina has now held, Ms. Hill "placed her fingers on the scales of justice." *South Carolina v. Murdaugh*, Op. No. 28329, at 2 (S.C. May 13, 2026).

5.     Acting under color of state law and abusing the power and authority of her elected office, Ms. Hill made repeated, improper extrajudicial communications to jurors in which she urged them not to be "fooled," "confused," "thrown off," or "convinced" by Murdaugh and his defense.  In so doing, Ms. Hill "became a character witness on behalf of the State, encouraging the jurors to question Murdaugh's credibility." and "essentially implored the jurors to find him guilty, the ultimate issue in the case." *Id.* at 15.

6.     Ms. Hill's motive was her self-serving desire for personal profit.  She wanted to write a book about the most high-profile trial in South Carolina history so she could buy a lake house.  And, as the South Carolina Supreme Court found, she believed a guilty verdict "would be the best way to sell books." *Id.* at 5.  She was, in the words of former Chief Justice Toal, "attracted by the siren call of celebrity" and allowed "her desire for the public attention of the moment to overcome her duty to her oath of office." *Id.* at 6.

7.     Ms. Hill's improper communications to the jury were deliberate acts, repeated across multiple occasions, directed at jurors she was sworn to protect from outside influence, by an officer of the court "elected by the very people who make up the Colleton County jury pool." *Id.* at 19.  Her conduct was, according to the South Carolina Supreme Court, "breathtaking," "disgraceful," and "unprecedented in South Carolina." *Id.* at 19–20.

8.     On May 13, 2026, the Supreme Court of South Carolina unanimously reversed Plaintiff's murder convictions and remanded for a new trial, holding that Ms. Hill's jury tampering violated Mr. Murdaugh's constitutional right to a fair trial by an impartial jury.

9.     Mr. Murdaugh brings this action to hold Ms. Hill accountable for her wrongful conduct under color of state law and to recover compensatory and punitive damages as provided by law.

## PARTIES

10.     Defendant Rebecca Hill was the Clerk of Court for the Circuit Court, Colleton County, South Carolina, from shortly after her election in November 2020 until March 25, 2024. She was elected to office by the voters of Colleton County pursuant to Article V, § 24, of the South Carolina Constitution.

11.     Plaintiff Richard Alexander Murdaugh is a former attorney who was charged with the murders of his wife Maggie Murdaugh and son Paul Murdaugh.  After a six-week jury trial in Colleton County, he was convicted on March 2, 2203.  His murder convictions were vacated by a published opinion of the South Carolina Supreme Court issued May 13, 2026.  *South Carolina v. Murdaugh*, Op. No. 28329 (S.C. May 13, 2026).

## JURISDICTION AND VENUE

12.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States.

13.     This Court has personal jurisdiction over Defendant Hill pursuant to Rule 4(k) of the Federal Rules of Civil Procedure because she is a citizen and resident of South Carolina and therefore subject to the jurisdiction of a South Carolina court of general jurisdiction.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claim occurred in South Carolina.

15.     The Charleston Division is the proper division pursuant to Local Civ. Rule 3.01(A) (D.S.C.) because a substantial part of the events giving rise to the claim occurred in Colleton County, which is in the Charleston Division.

## FACTUAL ALLEGATIONS

16.     Alex Murdaugh was indicted for the murder of his wife Maggie and son Paul on July 14, 2022.  His murder trial began January 23, 2023.  The trial ran for six weeks, ending with convictions on the evening of March 2, 2023, and sentencing on March 3, 2023.  The State rested its case-in-chief and the defense began its case on Friday, February 17, 2023.

17.     Court was not held on February 20, which was President's Day.  After returning from the holiday, Defendant Becky Hill began to enter the jury rooms often.  As the defense began its case, Ms. Hill told jurors, "Y'all are going to hear things that will throw you all off.  Don't let this distract you or mislead you."

18.     Additionally, Ms. Hill and Juror No. 826, the new jury foreperson, on multiple occasions went to another room to have private conversations lasting five or ten minutes.  Sometimes they would go into the jury room's single-occupancy bathroom together.  Ex. B ¶ 4.  Foreperson Juror No. 826 never said anything about the content of those conversations to other jurors.  Ms. Hill even instructed jurors they could not ask Foreperson Juror No. 826 about the conversations.

19.     Two days later, on Thursday, February 23, and continuing through the next day, Mr. Murdaugh testified in his own defense.  Before he began his testimony, Ms. Hill told jurors "not to be fooled" by the evidence Mr. Murdaugh's attorneys presented, which at least one juror understood to mean that Mr. Murdaugh would lie when he testified.  Ms. Hill also instructed the jury to "watch him closely," to "look at his actions," and to "look at his movements," which at least one juror understood to mean that Mr. Murdaugh was guilty.  Immediately after Mr.

Murdaugh testified, Foreperson Juror No. 826 told the jury that Mr. Murdaugh was crying on cue. She also criticized the former foreperson, Juror No. 589, for handing Mr. Murdaugh a box of tissues when he was crying on the stand because "that is what the defense wants us to do."

20.     The next court day after Mr. Murdaugh's testimony, Monday, February 27, Ms. Hill told the trial judge, the Honorable Clifton B. Newman, about a Facebook posting she purportedly saw on the evening of Friday, February 24 (the day Mr. Murdaugh's testimony concluded), while perusing a Facebook group page called "Walterboro Word of Mouth." The post, purportedly by Juror No. 785's ex-husband, allegedly stated that "his ex-wife was saying that she was on the jury and saying stuff about how her verdict was going to be."

21.     Judge Newman asked Ms. Hill to produce a copy of the posting. She could not produce a copy, but according to Ms. Hill, a subordinate employee in the Clerk's Office, Lori Weiss, discovered that the post was taken down and replaced with an apology post:

> Folks I posted a ugly post yesterday to which I have deleted and I kinda in a round about way directed it towards a certain person and I would like to apologize to everyone who read it that ugly for me to do that and yes I let Satan control me and I broke down and started drinking and when I was drunk I made that post and I'm sorry

22.     The "apology" post states the initial post was already deleted on February 16, so it would have been impossible for Ms. Hill to see the original post on February 24.

23.     Juror No. 785's ex-husband has averred in a sworn statement that he made no such posts. Mr. Murdaugh has obtained an authentic download of the entirety of Mr. Stone's Facebook activity from January 23, 2023, to March 2, 2023, which confirms he did not post the apology (the supposed original post if deleted would not be recoverable at this point under Facebook's retention policies) and that he in fact never posted anything to the "Walterboro Word of Mouth" Facebook page during the trial.

24.    On February 28, Ms. Hill questioned Juror No. 785 about the fictious post on "Walterboro Word of Mouth" alone in her office in the courthouse.  She told Juror No. 785 that someone had emailed her stating her ex-husband posted on the "Walterboro Word of Mouth" Facebook page that Juror No. 785 had been drinking with her ex-husband, and that while drunk she expressed opinions on the guilt or innocence of Mr. Murdaugh.  Juror No. 785 told Ms. Hill that never happened and that she had not seen her ex-husband in ten years.  Juror No. 785 asked to see the post, but Ms. Hill would not show it to her.  Ms. Hill directly asked Juror No. 785 whether she was inclined to vote guilty or not guilty.  Juror No. 785 said she had not made up her mind.

25.    Later that day, Ms. Hill told Juror No. 785 that the South Carolina Law Enforcement Division (SLED) and Colleton County Sheriff's Office personnel went to Mr. Stone's house, and he confirmed he made the post.  This was a fabrication by Ms. Hill.  Ms. Hill told Juror No. 785 she would somehow "reinstate" a restraining order Juror No. 785 previously had against Mr. Stone, which is something that Ms. Hill did not have the authority to do.

26.    Still later that day, Judge Newman examined Juror No. 785 regarding both the nonexistent Facebook post and the tenant/co-worker email[1] *in camera*.  Juror No. 785 described her interactions with Ms. Hill regarding the Facebook post.  She denied making any inappropriate comments about the case to third parties, and stated she wanted to hear closing arguments before forming an opinion on Mr. Murdaugh's guilt or innocence.

---

[1] A co-worker of a tenant of Juror No. 785 emailed the Court on February 27 stating that the tenant said her landlord was a juror and had expressed an opinion about the case when delivering a refrigerator to the property more than a week earlier.

27.     After Juror No. 785 was dismissed, Judge Newman said, "Oh boy.  I'm not too pleased about the clerk interrogating a juror as opposed to coming to me and bringing it to me." He was right to be concerned.

28.     The next day, on March 1, 2023, the jury visited Moselle, the site of the murders. During the visit, Foreperson Juror No. 826 and Ms. Hill walked off to have yet another private conversation.  In her book, Ms. Hill more vaguely hints at communicating her opinion on Mr. Murdaugh's guilt to the jury during the visit to the Moselle property:

> While the jurors viewed the Moselle property, we all could hear and see Alex's story was impossible.
>
> Some of us either from the courthouse, law enforcement, or jury at Moselle had an epiphany and shared our thoughts with our eyes.  At that moment, many of us standing there knew.  I knew and they knew that Alex was guilty.

29.     That day Judge Newman also held an *in camera* conference regarding the tenant/co-worker email, in which he decided to revisit the Facebook post issue with Ms. Hill:

> THE COURT: Okay.  Well, let me see what Becky is talking about.  I wanted to revisit the Facebook post that you mentioned yesterday.
>
> MS. HILL: Uh-huh, right.
>
> THE COURT: That's Becky Hill, the Clerk of Court.  Can you tell us about that Facebook post?
>
> MS. HILL: Yes.  I think it was Friday evening just for a brief moment I perused Facebook, got on Walterboro Word of Mouth, and saw where someone had said that – well, it was the ex-husband of a juror, and he said that he noticed that his ex-wife was saying that she was on the jury and saying stuff about how her verdict was going to be, and that he was the ex-husband but she was known for talking way too much. And then I just kept on scrolling because that was enough for me.  I've gotten enough.
>
> THE COURT: And how did you determine who he was talking about?
>
> MS. HILL: When I heard there was an email on Monday I figured the two went together, if it was true.
>
> THE COURT: Well, she's confirmed she has an ex-husband who she has three restraining orders out against so –

MS. HILL: Right.  So then we looked on Monday after you told me to try to go back and look for it and we couldn't find it.  But then we found out his name, and we found the post and printed it out where he said that he had put something up, but that he had deleted it at the time that he had put stuff out there that wasn't nice.

THE COURT: He said he got drunk afterwards.

MR. MEADORS: Something about the devil.

MR. HARPOOTLIAN: Didn't he say it was satan in it?

MS. HILL: Satan was in it, yes.  In all of the details, yes.

THE COURT: All right.

MS. HILL: Made me do it.

THE COURT: Okay.  I just wanted to have that on the record, you're reading a Facebook post by the ex-husband who said it.  Of course, you haven't talked with him so you don't know where he got his information from.

MS. HILL: I don't.  I can find it, though.

30.     But Ms. Hill never saw any such Facebook post.  She made it up.  Further, she knew the "apology" post was not posted by Juror No. 785's ex-husband.  Juror No. 785 showed Ms. Hill a picture of her ex-husband, which is not the Facebook profile picture of the other Mr. Stone's post about Satan.

31.      The next day, March 2, 2023—the day of the verdict—Juror No. 785 received a call from her ex-husband that she did not answer.  The call upset her because Ms. Hill's lies had led her to believe he was posting on Facebook about her and might be stalking her.  Juror No. 785 asked to speak with Ms. Hill.  She told Ms. Hill she was scared.  Ms. Hill told her that "the Murdaughs" probably "got to him," meaning her ex-husband.

32.     Ms. Hill once again asked her opinion regarding Mr. Murdaugh's guilt.  Juror No. 785 told her that Creighton Waters' closing was good, but that she still had questions.  Ms. Hill asked what questions and Juror No. 785 replied that she was concerned that no murder weapon was found.  Ms. Hill then asked, "well, what makes you think he's guilty?"  Juror No. 785 said

Paul's video at the dog kennels. Ms. Hill then told Juror No. 785 that "everything Mr. Murdaugh has said has been lies and that I should forget about the guns, they will never be seen again." Ms. Hill then asked Juror No. 785 about the views of the rest of the jury, telling her that if the foreperson would "just go in and ask for a raise in hands this would be over and done with" and "everyone needs to be on the same page."

33.     Juror No. 785 went to the jury room and, ten minutes later, was excused from the jury. In open court immediately after her excusal, Juror No. 785 asked Judge Newman if he had spoken with the Clerk of Court, referring to the conversation earlier that morning with Ms. Hill. Judge Newman responded that "I have not spoken with her today" and that this is "totally independent" of any "conversation" regarding her ex-husband, apparently misunderstanding her question to refer to the issue of the Facebook post.

34.     When the jury began deliberations that evening, Ms. Hill told them that "this shouldn't take us long," and that if they deliberated past 11 p.m., they would be taken directly to a hotel even though none were prepared to stay overnight.

35.     Ms. Hill told jurors that after the trial they would be famous and predicted that the media would request interviews with them. Ms. Hill even handed out reporters' business cards to jurors during the trial. Juror No. 578 took this to heart and made an appearance on Good Morning America the night of the verdict, which is why on the day the jury began deliberations he wore a suit coat for the first time during the trial. After the verdict and immediately before sentencing, Ms. Hill pressured the jury to speak as a group to reporters from a network news show. She traveled with jurors to New York City when they appeared on the Today show.

36.     Ms. Hill got her book deal. Her book, "Behind the Doors of Justice," was released on August 1, 2023. She had been planning to write a book about the trial even before it began. In

the period leading up to the trial, she repeatedly told coworkers that a guilty verdict would sell more books, and that she needed to sell books because "she needed a lake house."

37.    Ms. Hill's book, however, caused some jurors to come forward to describe her efforts to obtain her desired guilty verdict through jury tampering during trial.  In August 2023, several jurors provided affidavits or statements to Mr. Murdaugh's defense counsel, describing Ms. Hill's jury tampering.

38.    On September 5, 2023, Mr. Murdaugh filed a motion with the South Carolina Court of Appeals for leave to file a motion for a new trial based on the evidence of Ms. Hill's jury tampering.  The Court of Appeals granted the motion and Mr. Murdaugh filed his motion for a new trial on October 27.  On November 1, he petitioned the Supreme Court for a writ of prohibition to prohibit Judge Newman from adjudicating the new trial motion, based on public statements Judge Newman made after the jury returned guilty verdicts.  On November 15, the Supreme Court denied the petition as moot because Judge Newman recused himself from hearing the new trial motion.  On December 18, the Chief Justice appointed retired Chief Justice Jean H. Toal to serve as the trial judge hearing Mr. Murdaugh's motion for a new trial.

39.    The trial court ordered an evidentiary hearing on January 29, 2024.  A single juror testified one business day earlier, on January 26, to accommodate a scheduling conflict.  The jurors (identified by anonymous letters) testified as follows:

> Jurors C, F, L, E, O, Y, W, Q, and K testified that they did not hear Ms. Hill comment on the merits of the case before the verdict.

> Juror P testified that he heard Ms. Hill tell jurors, regarding Mr. Murdaugh's decision to testify in his own defense, to "watch his body language."

> Juror X testified that she heard Ms. Hill comment, regarding Mr. Murdaugh's decision to testify in his own defense, that it was rare for a defendant to testify in a criminal case and that "this is an epic day."

Juror Z testified that she heard Ms. Hill comment, regarding Mr. Murdaugh's decision to testify in his own defense, to watch Mr. Murdaugh's actions and to watch him closely. Juror Z testified that the comments did affect her verdict:

Q. All right. Was your verdict influenced in any way by the communications of the clerk of court in this case[?]

A. Yes, ma'am.

Q. And how was it influenced?

A. To me, it felt like she made it seem like he was already guilty.

Q. All right, and I understand that, that that's the tenor of the remarks she made. Did that affect your finding of guilty in this case?

A. Yes, ma'am.

40.     The trial court then examined Juror Z regarding her affidavit attached to Mr. Murdaugh's motion for a new trial, and she affirmed each paragraph therein, including averments that during trial Ms. Hill "told the jury 'not to be fooled' by the evidence presented by Mr. Murdaugh's attorneys, which I understood to mean that Mr. Murdaugh would lie when he testified," and that Ms. Hill "instructed the jury to 'watch him [Mr. Murdaugh] closely' immediately before he testified, including 'look at his actions' and 'look at his movements,' which I understood to mean that he was guilty."

41.     Ms. Hill testified after the jurors. She denied engaging in any jury tampering. She also denied stating that she wanted a guilty verdict to promote book sales. She admitted she plagiarized portions of her book and that her profits from its sale in the six months before it was withdrawn from publication because of her plagiarism were approximately $100,000. She admitted the book contained unfounded statements included for "poetic license" or "literary ease."

42.     Examination by the trial court revealed that Ms. Hill's denial, during direct examination, of questioning a juror during the murder trial was not truthful, and that she in fact did want a guilty verdict.

-11-

43.    Barnwell County Clerk of Court Rhonda McElveen testified next to rebut Ms. Hill's denial that she wanted a guilty verdict to promote book sales. Ms. McElveen was assisting in the courtroom during the murder trial. She testified:

Q. And did she discuss with you -- what, if anything, did she discuss with you about how she felt the verdict should turn out to be in the Murdaugh trial vis a vis in reference to the book, what would help the book?

A. A guilty verdict.

Q. Tell the judge and, and me what exactly she said to you that you remember. This is prior to the trial.

A. Okay. Well, first of all, she said we might want to write a book because she needed a lake house and I needed to retire, and from then, further conversation was that a guilty verdict would sell more books, and we left it at that. This was before even in December.

Q. And, and when, when -- did she ever say that again to you during this -- the, the weeks you spent there?

A. Several times. It could be said -- it was, you know, amongst friends in her office or we might be having dinner, that kind of stuff, but that's about it.

Q. That she needed a guilty verdict to sell more books?

A. That would be the best way to sell books, yes, sir.

Q. The best way to sell books.

Now, during this -- during this process, did she ever express to you an opinion on whether or not, in fact, was Mr. Murdaugh guilty of the murders of his son and his, his wife?

A. Yes, sir.

Q. Tell me. Tell me what she said and if you remember when.

A. I don't exactly remember when. I know it's over half of the trial had already happened, but the evidence was coming forth that it looked like he might be guilty. She made a comment that guilty verdict would be better for the sale of books.

44.     Ms. McElveen also testified that Ms. Hill made comments to her like "'[d]on't be fooled by the evidence presented by Mr. Murdaugh's attorneys," identical to statements reported by some jurors.  And she testified that Ms. Hill insisted on allowing a book writer (who wrote the forward to Ms. Hill's book) to sit in the well of the court during trial, where she could see sealed exhibits, under the subterfuge of being a Sunday school teacher.

45.     The final witness was the alternate juror, Juror 741.  She testified that Ms. Hill told jurors "the defense is about to do their side" and "[t]hey're going to say things that will try to confuse you" but "[d]on't let them confuse you or convince you or throw you off."

46.     At the conclusion of the hearing, the trial court ruled from the bench:

> Did Clerk of Court Hill make comments to any juror which expressed her opinion what the verdict would be?  Ms. Hill denies [doing so] and so the question becomes was her denial credible.
>
> I find that the clerk of court is not completely credible as a witness.  Ms. Hill was attracted by the siren call of celebrity.  She wanted to write a book about the trial and expressed that as early as November 2022, long before the trial began.  She denies that this is so, but I find that she stated to the clerk of court Rhonda McElveen and others her desire for a guilty verdict because it would sell books.  She made comments about Murdaugh's demeanor as he testified, and she made some of those comments before he testified to at least one and maybe more jurors.
>
> . . .
>
> The clerk of court allowed public attention of the moment to overcome her duty.

47.     The trial court nevertheless denied the motion for a new trial, reasoning that there is no presumption of prejudice from tampering with jurors during a trial about the matter pending before the jury and Mr. Murdaugh failed to prove that Ms. Hill's comments changed the jury's verdict.

48.     On March 25, 2024, Ms. Hill resigned from office.

49.     In May 2024, it was reported that the State Ethics Commission had referred ethics complaints against Ms. Hill for criminal prosecution.

50.     On May 14, 2025, Ms. Hill was arrested and charged with perjury, obstruction of justice, and misconduct in office.  On December 8, 2025, Ms. Hill pleaded guilty to those charges. Her perjury conviction concerned her testimony at the evidentiary hearing for Mr. Murdaugh's motion for a new trial, in which she testified she did not give news media access to sealed trial exhibits including crime scene photographs of Maggie and Paul Murdaugh's slain bodies. Forensic evidence, however, conclusively proved she escorted news medica to secured areas of the courthouse after hours, where she allowed them to photograph sealed exhibits.  Ms. Hill attempted to profit from Maggie and Paul's murders not only by advising the jury to convict Mr. Murdaugh so that she could write a book about his conviction, but even by selling access to grisly photographs of their slain bodies.

51.     On May 13, 2026, the South Carolina Supreme Court vacated the order denying the motion for a new trial.

52.     The South Carolina Supreme Court ruled that "[b]oth the State and Murdaugh's defense skillfully presented their cases to the jury" but "their efforts were in vain because Colleton County Clerk of Court Rebecca Hill placed her fingers on the scales of justice, thereby denying Murdaugh his right to a fair trial by an impartial jury," and "we have no choice but to reverse the denial of Murdaugh's motion for a new trial due to Hill's improper external influences on the jury." *South Carolina v. Murdaugh*, Op. No. 28329, at 2 (S.C. May 13, 2026).

53.     The South Carolina Supreme Court, reviewing the evidentiary record including Ms. Hill's own sworn testimony, stated, "we hold Murdaugh established Hill made comments that the day Murdaugh testified was 'epic' or 'important' and urged the jurors not to be 'fooled,'

-14-

'confused,' 'thrown off,' or 'convinced' by Murdaugh and to watch Murdaugh's body language closely." *Id.* at 15. It further ruled that "Hill clearly advised the jurors to find Murdaugh and the evidence he presented not credible and, essentially, urged them to render a guilty verdict." *Id.* at 19.

54. The South Carolina Supreme Court ruled that Ms. Hill engaged in this wrongful conduct under color of state law, such that her "position as the Colleton County Clerk of Court, an officer of the court who managed the trial and was the primary caretaker of the jury, amplified the impact Hill's comments had on the jury." *Id.*

55. The South Carolina Supreme Court further ruled that "[t]he breathtaking and disgraceful effort of Hill to undermine the jury process is unprecedented in South Carolina," and "[a]ccordingly, we hold Murdaugh's right to a fair trial by an impartial jury was violated" by Ms. Hill's intentional misconduct. *Id.* at 20.

56. Following the revelation of Mr. Murdaugh's financial crimes, a South Carolina court placed him in receivership. Mr. Murdaugh had funded his murder trial defense with a $600,000 withdrawal from his 401(k) retirement funds. This withdrawal to fund his legal defense was authorized by the court overseeing the receivership. These retirement funds were employer contributions to his retirement account untainted by any criminal activity and were his sole remaining asset.

57. Mr. Murdaugh spent the entire $600,000 on his trial defense. The South Carolina Supreme Court has ruled that Ms. Hill's actions—motivated by her own desire to profit from the trial—caused these funds to be lost. *See id.* at 2 (ruling that Mr. Murdaugh's trial defense was "in vain because Colleton County Clerk of Court Rebecca Hill placed her fingers on the scales of justice, thereby denying Murdaugh his right to a fair trial by an impartial jury").

**FOR A FIRST CAUSE OF ACTION**
**Jury tampering in violation of the Sixth and Fourteenth Amendments**
**to the United States Constitution**
**42 U.S.C. § 1983**

58.     Plaintiff incorporates each of the foregoing paragraphs as if set forth verbatim.

59.     The right to trial before an impartial jury is secured by the Sixth and Fourteenth Amendments to the U.S. Constitution.

60.     As set forth above, Mr. Murdaugh's right to trial before an impartial jury was violated by Ms. Hill.

61.     As set forth above, Ms. Hill violated Mr. Murdaugh's constitutional right to a fair trial while acting under color of state law as the elected Clerk of Court.

62.     As a result of Ms. Hill's actions, Mr. Murdaugh suffered monetary damages of $600,000.

63.     As set forth above, Ms. Hill's conduct was motivated by evil motive or intent and involved reckless or callous indifference to Mr. Murdaugh's federally protected right to trial before an impartial jury, including Ms. Hill's desire to profit personally from Mr. Murdaugh's trial.  Mr. Murdaugh therefore is entitled to an award of punitive damages against Ms. Hill.

64.     Mr. Murdaugh is also entitled to recovery of attorney's fees and costs under 42 U.S.C. § 1988.

**PRAYER**

WHEREFORE, Plaintiff prays for judgment against Defendant in this matter in a sum sufficient to adequately compensate him for damages suffered, for punitive damages, for reasonable attorney's fees, for the costs of this action, and for such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

/s/ Phillip D. Barber
Richard A. Harpootlian (Fed. ID No. 1730)
Phillip D. Barber (Fed. ID No.12816)
Andrew R. Hand (Fed. ID No. 12176)
RICHARD A. HARPOOTLIAN, P.A.
1410 Laurel Street (29201)
Post Office Box 1090
Columbia, SC 29202
(803) 252-4848
rah@harpootlianlaw.com
pdb@harpootlianlaw.com
arh@harpootlianlaw.com

James M. Griffin (Fed. ID No. 1053)
Margaret N. Fox (Fed. ID No. 10576)
GRIFFIN HUMPHRIES LLC
4408 Forest Drive (29206)
Post Office Box 999
Columbia, South Carolina 29202
(803) 744-0800
jgriffin@griffinhumphries.com
mfox@griffinhumphries.com

*Attorneys for Plaintiff*

May 17, 2026
Columbia, South Carolina

-17-