**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | | |
|---|---|---|
| Richard Alexander Murdaugh, Sr., | ) | C/A No.: 2:26-cv-01989-RMG |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | **MEMORANDUM IN SUPPORT OF** |
| v. | ) | **DEFENDANT'S MOTION TO** |
| | ) | **DISMISS** |
| Rebecca Hill, | ) | |
| | ) | |
| Defendant. | ) | |

Defendant submits this Memorandum in Support of her Motion for Dismiss Plaintiff's Complaint. For the reasons outlined below, Defendant respectfully requests this Court find Plaintiff's Complaint fails to state a claim upon which relief can be granted and/or this Court lacks subject-matter jurisdiction, and grant Defendant's Motion to Dismiss under Fed. R. Civ. P. 12(b)(6) and/or Fed. R. Civ. P. 12(b)(1).

Defendant moves pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for dismissal of Plaintiff's suit based upon Plaintiff's failure to state a claim for relief. Plaintiff alleges, in short, that Defendant's actions deprived him of an impartial jury and that he is, therefore, entitled to recover the full sum of the money he spent on his criminal defense. Such damages fall outside the scope of 42 U.S.C. § 1983 and 1988: the Fourth Circuit has never established that damages stemming from the legal costs associated with defending an underlying criminal case are redressable under the statute. Further, to the extent that other circuits have considered the question, they, along with the Fourth Circuit, have been clear that in the event such damages are redressable, a plaintiff must show that his damages were caused by the defendant's actions. Such cannot be the case here, where the entirety of the economic damages claimed by the Plaintiff would have been spent on his criminal defense regardless of any actions taken by this Defendant. Similarly, and for

much the same reasons, Defendant is entitled to dismissal of Plaintiff's claims pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, where the compensatory damages sought by the Plaintiff are not traceable to the Defendant's actions. Additionally, to the extent, if any, that Plaintiff argues otherwise that, inconsistent with his Complaint, he seeks damages related to the second, future trial, Defendant likewise moves to dismiss Plaintiff's Complaint under Rule 12(b)(1) of the Federal Rules of Civil Procedure: under such a theory, Plaintiff's damages have not, and indeed might not ever, accrue, and Plaintiff's suit would therefore not be ripe for adjudication, divesting this Court of jurisdiction to entertain the same.

Finally and most critically, even had Plaintiff stated a compensable claim, Defendant is nonetheless entitled to Eleventh Amendment immunity, quasi-judicial immunity, and qualified immunity, all of which bar Plaintiff's suit.

### STANDARD OF REVIEW

Defendant moves to dismiss Plaintiff's Complaint under Rule 12(b)(6) and 12(b)(1) of the Federal Rules of Civil Procedure. A Rule 12(b)(6) motion examines whether Plaintiff has stated a claim upon which relief can be granted. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). The United States Supreme Court has made clear that, under Rule 8 of the Federal Rules of Civil Procedure, the complaint must contain sufficient factual matter, accepted as true, to state a claim that is plausible on its face. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A claim is facially plausible when the factual content allows the court to reasonably infer that the defendant is liable for the misconduct alleged. *Iqbal*, 556 U.S. at 678. When considering a motion to dismiss, the court must accept as true all of the factual allegations contained in the complaint. *Erickson v. Pardus*, 551 U.S. 89, 94, 127 S. Ct. 2197, 167 L. Ed. 2d

1081 (2007). The court "may also consider documents attached to the complaint, see Fed. R. Civ. P. 10(c), as well as those attached to the motion to dismiss, so long as they are integral to the complaint and authentic." *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (citing *Blankenship v. Manchin*, 471 F.3d 523, 526 n.1 (4th Cir. 2006)).

"The fundamentals of standing are well-known and firmly rooted in American constitutional law. *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024). "To establish Article III standing, a plaintiff must identify (1) an injury that he or she suffered (2) that can be fairly traced to the defendant's conduct and (3) that will likely be rectified by the relief the plaintiff seeks." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992).

## ARGUMENT

Plaintiff alleges that during the course of his criminal trial for the murders of his wife and son, which began on January 23, 2023, and ended on March 2, 2023, Defendant Becky Hill had multiple improper contacts with, and made multiple improper, prejudicial comments to, the jury. ECF No. 1, at pp. 4-9. On May 13, 2026, the South Carolina Supreme Court set aside Plaintiff's murder convictions and ordered a new trial upon finding Defendant's actions were improper and presumptively prejudiced the jury's verdict. *Id*. at p. 3. Plaintiff brings the instant civil suit under 42 U.S.C. § 1983 seeking to recover compensatory damages for Defendant's alleged constitutional violation of Murdaugh's Sixth Amendment right to a fair trial by an impartial jury, secured by the Fourteenth Amendment. *Id*. at p. 16. Plaintiff seeks compensatory damages in the amount of $600,000.00, which represents the flat fee paid to Plaintiff's legal defense team, a combination of attorneys from Griffin Humphries, LLC, and Richard A. Harpootlian, P.A., for their work in his underlying state criminal trial. *Id*. at p. 15.

Plaintiff does not contend Defendant's alleged constitutional violation of Murdaugh's Sixth Amendment right to a fair trial by an impartial jury, secured against the states by the Fourteenth Amendment, caused Plaintiff to incur the additional legal costs of defending any post-trial and appellate litigation or future retrial. Rather, Plaintiff seeks to fund such a possible retrial pursuant to a novel theory of recovery under 42 U.S.C. § 1983, contending that Defendant's alleged constitutional violation caused the entirety of his underlying state murder trial and his economic loss of the funds spent in defense thereon.

I.    **The foundational principles § 1983's remedial provision bar Plaintiff's recovery of legal defense fees incurred in connection with his underlying state criminal trial.**

Plaintiff's suit is based upon a novel theory of liability and recovery. To the undersigned counsels' knowledge, this is a case of first impression: no Federal Circuit or District Court has addressed the question of whether a criminal defendant who alleges their Sixth Amendment right to an impartial jury has been violated can recover damages for the legal defense fees incurred in connection with the underlying state criminal proceeding in a subsequent civil suit brought pursuant to 42 U.S.C. § 1983. Even expanding this inquiry beyond the narrow scope of the Sixth Amendment, the Fourth Circuit has never directly addressed whether a § 1983 plaintiff "can recover attorneys' fees incurred in connection with an underlying state criminal proceeding." *Glass v. Anne Arundel Cty.*, No. WDQ-12-1901, 2015 U.S. Dist. LEXIS 100065, at *8 (D. Md. July 30, 2015); *see White v. City of Greensboro*, 608 F. Supp. 3d 248, 265 (M.D.N.C. 2022).

Absent such guiding law, Defendant turns to the general principles upon which § 1983 remedies are based and to other circuits' treatment of Plaintiff's theory of liability and recovery. The Supreme Court has "repeatedly noted that 42 U.S.C. § 1983 creates a species of tort liability." *Heck v. Humphrey*, 512 U.S. 477, 483 (1994) (quoting *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 304 (1986) (internal quotation marks omitted)). As such, the common law of torts

4

"provide[s] the appropriate starting point for the for the [damages] inquiry under § 1983." *Carey, v. Piphus*, 435 U.S. 247, 257-58 (1978); *Stachura*, 477 U.S. at 307 ("Congress adopted [the] common-law system of recovery when it established liability for 'constitutional torts.'"). The general purpose of damages under 42 U.S.C. § 1983 is to "**compensate persons for injuries** that are **caused by** the deprivation of constitutional rights." *Carey*, 435 U.S. at 254-257 (emphasis added) ("[D]amages awards under § 1983 should be governed by the principle of compensation."); *see Stachura*, 477 U.S. at 307 ("Deterrence is also an important purpose of this system, but it operates through the mechanism of damages that are *compensatory* — damages grounded in determinations of plaintiffs' actual losses." (emphasis in original)).

Like the common-law tort claims upon which § 1983 were modeled, claims brought pursuant to § 1983 require both "but-for" and proximate cause analyses. *Evans v. Chalmers*, 703 F.3d 636, 647 (4th Cir. 2012); *see Malley v. Briggs*, 475 U.S. 335, 346 n.7 (1986) ("§ 1983 'should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions.'" (quoting *Monroe v. Pape*, 365 U.S. 167, 187 (1961)). The Supreme Court has instructed, "[i]n order to further the purpose of § 1983, the rules governing compensation for injuries caused by the deprivation of constitutional rights should be tailored to the interests protected by the particular right in question just as the common-law rules of damages themselves were defined by the interests protected in the various branches of tort law." *Carey*, 435 U.S. at 258-59. Ordinarily, then, the compensation awarded under a proven constitutional violation is governed by the interests intended to be protected by the right and by the damages foreseeably stemming from that right's violation. In the instant case, however, Plaintiff prays for damages consisting of the entire cost of the underlying criminal trial, during the course of which Plaintiff alleges that Defendant violated his Sixth Amendment right. The Fourth Circuit has never

5

recognized § 1983 as countenancing such a broad grant of damages, and those circuits that have addressed the issue have, predominantly, rejected such an approach.

### A. Federal circuits are split as to whether § 1983 permits recovery of legal fees incurred during an underlying state criminal proceeding.

There is a split of authorities on the issue of whether a criminal defendant, whose constitutional rights have been violated in an underlying state criminal proceeding, can recover damages for incarceration, legal costs and/or fees, or emotional distress in a subsequent § 1983 suit. Compare *Townes v. City of New York*, 176 F.3d 138, 148 (2d Cir. 1999) (barring recovery of damages for attorneys' fees and costs incurred in underlying criminal proceeding when evidence for gun possession charges arose from a violation of the Fourth Amendment), with *Borunda v. Richmond*, 885 F.2d 1384, 1389-90 (9th Cir. 1988) (recognizing recovery of money spent on legal representation's defense of underlying, acquitted criminal charges as compensatory damages for economic harm).

Defendant first addresses the Second Circuit's approach. In *Townes*, the Second Circuit panel rejected the plaintiff's § 1983 compensatory damages claim relating to his conviction and incarceration stemming from a Fourth Amendment violation. 176 F.3d 138 (2d Cir. 1999). In his criminal trial, the plaintiff moved to suppress a firearm found pursuant to a stop and search of the taxicab in which he was a passenger. 176 F.3d at 142. The plaintiff's motion was denied, and he subsequently entered a guilty plea for the charge of unlawful possession of a firearm. *Id.* After over two years of incarceration, the state appellate division reversed the conviction upon finding the police lacked probable cause to seize and search the taxicab, which subsequently resulted in dismissal of the indictment. *Id.* The Second Circuit panel first held the fruit of the poisonous tree doctrine "cannot link the unreasonable seizure and search to Townes's conviction and incarceration because this evidentiary doctrine is inapplicable to civil § 1983 actions." 176 F.3d at 145. The

panel explained that the fruit of the poisonous tree doctrine is calculated to safeguard the constitutional rights of suspects by deterring future unlawful conduct by state actors through incentive, "avoidance of the suppression of illegally seized evidence," rather than by creating a "personal constitutional right for the party aggrieved." *Id.* (quoting *United States v. Calandra*, 414 U.S. 338, 347-48 (1974)). The panel found that the doctrine's "deterrence objective ha[d] already been achieved (though late) by the rulings of the Appellate Division and Court of Appeals," and reasoned that extending "the doctrine to § 1983 actions would impermissibly recast the relevant proximate cause inquiry to one of taint and attenuation." 176 F.3d at 146.

The Second Circuit likewise found that the plaintiff's incarceration was not proximately caused by the alleged Fourth Amendment violation. 176 F.3d at 146-47. The panel determined "the unconstitutional seizure and search of Townes's person was not a proximate cause of his conviction" because the trial court's refusal to suppress the evidence was "an intervening and superseding cause of Townes's conviction," 176 F.3d at 146-47. As a result, the panel affirmed the dismissal of the plaintiff's complaint pursuant to Fed. R. Civ. P. 12(b)(6). 176 F.3d at 147.

Thereafter, the panel discussed a second, independent reason for which the plaintiff was foreclosed from recovery: recovery of compensable damages was improper where, "the injury [plaintiff] pleads . . . does not fit the damages he seeks." 176 F.3d at 148. The Second Circuit panel pointed out the "gross disconnect between the constitutional violations (Townes's Fourth Amendment right to be free from unreasonable searches and seizures) and the injury or harm for which Townes seeks a recovery (his subsequent conviction and incarceration)." 176 F.3d at 148 (explaining "[t]he evil of an unreasonable search or seizure is that it invades privacy, not that it uncovers crime, which is no evil at all."). The panel concluded this "gross disconnect" ran afoul of the Supreme Court's directive to tailor § 1983 liability "to fit the interests protected by the

7

particular constitutional right in question." *Id.* (citing *Carey*, 435 U.S. at 257-58). Moreover, the panel reasoned that "[n]o Fourth Amendment value would be served" if plaintiff reaped the financial benefit sought in addition to already reaping "an enormous benefit by reason of the illegal seizure and search to which he was subjected: his freedom." 176 F.3d at 148. The panel reiterated the purpose of suppression is to deter state actors from unconstitutionally invading into law-abiding citizens' privacy, and to compensate the plaintiff for his conviction and time served "would vastly overdeter [sic] police officers and would result in a wealth transfer that is peculiar, if not perverse." *Id.* (internal quotation marks and citation omitted). The panel affirmed the dismissal of plaintiff's complaint pursuant to Fed. R. Civ. P. 12(b)(6) for failing to "seek the only relief to which he may have been entitled." 176 F.3d at 149.

Alternatively, in *Borunda*, the Ninth Circuit rejected the appellant's contention "that admission of the amount of attorneys' fees expended [by respondents] during the prior state court criminal proceeding as an element of § 1983 damages was a prejudicial error." 885 F.2d 1384, 1389 (9th Cir. 1988). The *Borunda* respondents were previously charged with resisting arrest, assault on a police officer, and public intoxication by the appellant officers. 885 F.2d at 1387. After a jury trial, the respondents were acquitted on all criminal charges and subsequently brought a § 1983 action against the appellants. *Id.* After a four-day trial in the § 1983 action, the jury returned a special verdict in favor of the respondents, awarding them both approximately $11,000.00 each. *Id.*

First, the panel quickly disposed of two cases cited by the appellant in support of this proposition as inapposite because the cases involved attorney fees awarded pursuant to § 1988, not § 1983. 885 F.2d at 1389. Next, the panel found the respondent's "expenditures for legal representation during the prior criminal proceeding most assuredly constitute[d] economic harm,"

which is a compensable injury under § 1983. *Id.* at 1390. The Ninth Circuit panel held that "[t]he reasonable amount of these expenditures [for legal representation], if proved to the jury's satisfaction to be the consequence of appellant's illegal conduct, is recoverable as compensatory damages." *Id.* The Ninth Circuit panel rejected the appellants' argument "that their illegal conduct did not proximately cause the expenditure of attorneys' fees in defending against the criminal charge" because the prosecutor's decision to prosecute the case was an intervening and superseding exercise of independent judgment. 885 F.2d at 1390. While recognizing that "the prosecutor filing the criminal complaint is presumed to have exercised independent judgment in determining that probable cause for an arrest exists," the panel found the petitioner's had submitted "sufficient evidence to challenge the presumption." 885 F.2d at 1390. The panel determined based on the evidence presented, "[t]he jury was entitled to find . . . that appellants procured the filing of the criminal complaint by making misrepresentations to the prosecuting attorney." *Id.* Thus, "[t]he amount of attorneys' fees incurred during the criminal prosecutions was a direct and foreseeable consequence of the appellant's unlawful conduct." *Id.* As such, the Fifth Circuit found "no abuse of discretion in its admission." *Id.*

The Third and Seventh Circuits have adopted the *Townes* rational and rejected *Borrunda*. *See Hector v. Watt*, 235 F.3d 154, 157 (3d Cir. 2000), *as amended* (Jan. 26, 2001) (rejecting the § 1983 plaintiff's compensatory damages claim for expenses incurred during his underlying criminal prosecution, including $23,000.00 in attorney's fees, upon finding "damages for an unlawful search should not extend to post-indictment legal process, for the damages incurred in that process are too unrelated to the Fourth Amendment's privacy concerns."); *Martin v. Marinez*, 934 F.3d 594, 605 (7th Cir. 2019) (affirming the district court's limitation of the § 1983 plaintiff's compensatory damages claim for his 65-day incarceration and lost income resulting from his

9

underlying criminal prosecution upon determining to allow plaintiff "to recover damages for his subsequent imprisonment, set in motion by an arrest supported by probable cause, would amount to precisely the sort of mismatch between the violation and the damages that *Townes* and *Hector* sought to avoid."). Defendant urges this Court to do the same.

**B.  This Court should adopt the second circuit's rationale barring recovery of legal fees incurred during an underlying state criminal proceeding in a subsequent § 1983 action.**

*Townes* is the proper persuasive authority for this Court's determination of the issues presented by Plaintiff's Complaint. Defendant submits that the Third and Seventh Circuit adopted *Townes*, as opposed to *Borrunda,* because the Ninth Circuit's decision improperly omits any discussion of the Supreme's Court tailoring instruction. *see Carey*, 435 U.S. at 258-59; *Borrunda*, 885 F.2d at 1389-90; *Townes*, 176 F.3d at 148 (recognizing "[t]he goal of the Court's § 1983 jurisprudence has been to tailor liability to fit the interested protected by the particular constitutional right in question."); *Hector*, 235 F.3d at 159 (explaining "caselaw makes clear that we should keep in mind the interests protected by the constitutional provision, and should weigh competing policies in designing remedies for Fourth Amendment violations."); *Martin*, 934 F.3d at 599 (framing the issue on appeal as "whether the post-arrest damages for incarceration Martin seeks would effectively redress the interests the Fourth Amendment is intended to protect.").

Failing to consider the tailoring of liability to fit the interest protected by a given constitutional right, the Ninth Circuit focused solely on the theory of proximate causation when assessing the plaintiff's entitlement to compensatory damages under § 1983. *Borrunda*, 885 F.2d at 1389. The Ninth Circuit grounded their decision with support from *Kerr v. City of Chicago*, 424 F.2d 1134 (7th Cir. 1970), *cert. denied*, 400 U.S. 833 (1970), finding *Kerr* permitted a plaintiff in a civil rights action to "recover the attorneys' fees in a state criminal action where the expenditure

is a foreseeable result of the acts of the defendant." *Id.* The Seventh Circuit, however, has since made clear that *Kerr* is not controlling precedent in § 1983 actions brought by criminal defendants seeking damages for incarceration, legal costs and/or fees, or emotional distress stemming from a Fourth or Fifth Amendment violation in their underlying criminal proceedings. *Martin*, 934 F.3d at 600. In rejecting the *Martin* plaintiff's contention that *Kerr* established that he was entitled to pursue damages for his post-arrest incarceration, the Seventh Circuit explained "[t]he precise issue in *Kerr* was [] whether the plaintiff should have been allowed to present evidence in his civil case of attorneys' fees expended in his underlying criminal case, which hinged entirely on his involuntary confession." 934 F.3d at 600 (citing *Kerr*, 424 F.2d at 1141). The Seventh Circuit panel further explained that *Kerr* redressed "the precise interest which the Fifth Amendment protects: the right not to be compelled in a criminal case to be a witness against oneself," as "the damages sought—expenses of defending the criminal trial prosecuted on the strength of the involuntary confession—[arose] directly from the constitutional violation." 934 F.3d at 601.

Moreover, *Borrunda* and *Kerr* dealt with evidentiary issues inapplicable here. *See Martin*, 934 F.3d at 604 (defining the *Borunda* issue as "whether the district court had erred in admitting evidence of the plaintiffs' prior acquittal of criminal charges and evidence of attorneys' fees spent during the criminal proceeding."). The factual circumstances here are likewise distinguishable from *Borunda*, in which the jury there found the officers lacked probable cause for the arrest – here, Plaintiff has not alleged, and, indeed, cannot allege, that any action of Defendant affected the probable cause upon which Plaintiff's prosecution and trial were based. *See Martin*, 934 F.3d at 605. As such, the factual situations in *Townes*, *Hector*, and *Martin* are more analogous. *See Townes*, 176 F.3d at 142; *Hector*, 235 F.3d at 155; *Martin*, 934 F.3d at 596-97. The Ninth Circuit's failure to address the Supreme Court's tailoring instruction and the distinguishable factual and legal issues

11

on appeal in *Borrunda* demonstrate *Townes* is a more appropriate persuasive guide to this Court's analysis of the instant matter.

The Fourth Circuit has favorably cited to *Townes*; this "certainly suggests that the court is not disapproving of the analysis." *White v. City of Greensboro*, 608 F. Supp. 3d 248, 266 (M.D.N.C. 2022); *see Evans v. Chalmers*, 703 F.3d 636, 647 (4th Cir. 2012) (citing *Townes* in support of the Court's explanation that "constitutional torts, like their common law brethren, require a demonstration of both but-for and proximate causation."). Furthermore, *Townes* has been cited repeatedly by district courts within the Fourth Circuit when assessing civil damages for constitutional violations under § 1983. *Id.*; *see, e.g.*, *Ware v. James City Cty.*, 652 F. Supp. 2d 693 (E.D. Va. 2009) (dismissing plaintiff's unreasonable search and seizure claim under § 1983 on summary judgment while noting plaintiff "has already reaped an enormous benefit by reason of the illegal seizure [] to which he was subjected: his freedom." (alteration in original) (quoting *Townes*, 176 F.3d at 148)), *aff'd sub nom.*, *Ware v. James City Cty.*, 380 F. App'x 274 (4th Cir. 2010) (unpublished). Indeed, this very Court has cited to *Townes* favorably twice. *Vaughn v. Whitfield*, No. 2:12-2405-RMG-BHH, 2013 U.S. Dist. LEXIS 131293, at *51-54 (D.S.C. July 30, 2013) (citing *Townes* in support of the Court's causation analysis and damages assessment which resulted in recommending dismissal because plaintiff "has not pled or proven actionable injury based on [any] alleged unlawful search."), *report and recommendation adopted sub nom.*, *Vaughn v. Whitfield*, No. 8:12-CV-2405-RMG, 2013 U.S. Dist. LEXIS 130279, at *9-10 (D.S.C. Sept. 12, 2013) (adopting the Magistrate Judge's Report and Recommendation in full and dismissing plaintiff's unreasonable search and seizure claim under § 1983 on summary judgment); *Cullins v. Sumter City Police Dep't*, No. 8:10-264-RMG-BHH, 2011 U.S. Dist. LEXIS 8056, at *20-22 (D.S.C. Jan. 4, 2011) (same), *report and recommendation adopted sub nom.*, *Cullins v. Sumter City*

12

*Police Dep't*, No. 8:10-264-RMG-BHH, 2011 U.S. Dist. LEXIS 8107 (D.S.C. Jan. 27, 2011) (same).

Accordingly, Defendant urges this Court to adopt the rationale set forth in *Townes* when analyzing the two (2) dispositive questions before it: (1) whether Defendant's alleged constitutional violation caused the attorneys' fees incurred by Plaintiff in connection with his underlying criminal trial; and (2) whether awarding damages to compensate Plaintiff for the cost of defending the underlying criminal trial would be tailored to the interests protected by the Sixth Amendment right to trial by an impartial jury.[1]

### II.    There is no causal connection between Defendant's alleged constitutional violation and the attorneys' fees incurred by Plaintiff in his underlying criminal trial.

Plaintiff is not entitled to recovery of his expenditures for legal representation in his underlying criminal proceeding. Plaintiff asserts he "funded his murder trial defense with a $600,000.00 withdrawal from his 401(k) retirement funds," which was "his sole remaining asset." ECF No. 1 at p. 15. Initially, the "loss" of such attorneys' fees may constitute monetary harm potentially compensable under § 1983. *Stachura*, 477 U.S. at 307 (holding compensatory damages under § 1983 may encompass "out-of-pocket loss and other monetary harms."). Plaintiff, however, has failed to feasibly allege that Defendant's actions caused "these funds to be lost." ECF No. 1 at 15.

Plaintiff cannot recover compensable damages here because "the injury he pleads . . . does not fit the damages he seeks." *Townes*, 176 F.3d at 148. Defendant's alleged constitutional violation

---

[1] While Defendant acknowledges common-law torts serve as a starting point for the analysis under § 1983, Defendant is unaware of any existing common-law analogues. *See Hector*, 235 F.3d at 156 (explaining "the common law of torts [is] the starting point, not the only consideration, in analyzing a claim under § 1983.").

was neither the "but-for" or proximate cause of Plaintiff's underlying criminal trial. *Evans*, 703 F.3d at 647. Unlike the criminally accused in *Martin*, *Townes*, *Hector*, *Borunda*, and *Kerr*, the initiation of the underlying criminal charges here had no connection to Defendant's alleged constitutional violation. The Plaintiff's criminal trial did not "hinge entirely on" Defendant's alleged constitutional violation, and nor did the "expenses of defending the criminal trial . . . arise directly from the [alleged] constitutional violation." *Martin*, 934 F.3d at 600-01. Plaintiff's underlying murder trial was not initiated by Defendant's alleged constitutional violation. Rather, Plaintiff's murder trial was initiated by the Attorney General of the State of South Carolina's "exercise[] [of] independent judgment" in deciding to prosecute, and the Colleton County Grand Jury's "exercise[] [of] independent judgment" in indicting, Plaintiff. *Borunda*, 885 F.2d at 1390; *Townes*, 176 F.3d at 142. While the prosecution's election to proceed with the indictment of the plaintiffs in *Cullins* and *Vaughn* were superseding proximate causes severing the chain of causation between the constitutional violation and the plaintiffs' trials, here, the State's decision to prosecute, and the Grand Jury's indictment of, Plaintiff were the sole "but-for" causes of his underlying murder trial, and in turn, the sole "but-for" causes of the economic injuries allegedly suffered. *see Cullins v. Sumter City Police Dep't*, No. 8:10-264-RMG-BHH, 2011 U.S. Dist. LEXIS 8056, at *21-22; *Vaughn v. Whitfield*, No. 2:12-2405-RMG-BHH, 2013 U.S. Dist. LEXIS 131293, at *52.

Likewise, Plaintiff's expenditures for legal representation in his state criminal case was not a foreseeable result of Defendant's alleged constitutional violation. *See Borunda*, 885 F.2d at 1390 (citing *Kerr*, 424 F.2d 1134). Plaintiff's defense of the murder charges and fees incurred would have occurred regardless of Defendant's alleged jury tampering taking place. Allowing Plaintiff to recover the attorneys' fees incurred during the underlying criminal proceeding, which was set in motion by a Grand jury Indictment, "supported by probable cause, would amount to precisely to

14

sort of mismatch between the violation and damages that *Townes* and *Hector* sought to avoid." *Martin*, 934 F.3d at 605.

Plaintiff's underlying criminal proceeding, then, was not the natural consequence of Defendant's actions, and awarding Plaintiff legal fees incurred therefrom would not compensate him for any injury caused by the alleged deprivation of his Six Amendment right to an impartial jury. *Malley v. Briggs*, 475 U.S. 335, 346 n.7 (1986) (quoting *Monroe v. Pape*, 365 U.S. 167, 187 (1961)). It is not the abstract value of a constitutional right, even one central to our system of ordered liberty, that forms the basis for § 1983 remedies; rather, it is proof of **actual**, **compensable injury**. *Stachura*, 477 U.S. at 308 (emphasis added); *Carey*, 435 U.S. at 254 (noting "[r]ights, constitutional and otherwise, do not exist in a vacuum. Their purpose is to protect persons from injuries to particular interests."). Plaintiff has alleged no damages related to his protected interests under the Sixth Amendment, but rather "has exclusively alleged injuries that resulted from . . . his [] criminal prosecution." *Vaughn v. Whitfield*, No. 2:12-2405-RMG-BHH, 2013 U.S. Dist. LEXIS 131293, at *52. "There is no evidence, nor can it be reasonably inferred, that any damages resulted from the [constitutional violation] itself." *Cullins v. Sumter City Police Dep't*, No. 8:10-264-RMG-BHH, 2011 U.S. Dist. LEXIS 8056, at *21. Here, the charges brought against the Plaintiff were supported by probable cause – Plaintiff has not pled that Defendant's actions had any effect on the existence of probable cause. Accordingly, Plaintiff would have incurred the expenses complained of here regardless of, and entirely apart from, any actions taken by this Defendant. Too, and as argued *infra*, the interest protected by the Sixth Amendment, "that guilt shall not escape or innocence suffer" has been independently preserved; Plaintiff's conviction has been overturned. *Berger v. United States,* 295 U.S. 78, 88 (1935).

15

Accordingly, Defendant respectfully requests this Court dismiss Plaintiff's Complaint pursuant to Fed. R. Civ. P. 12(b)(6) because Defendant's alleged constitutional violation did not contribute to the attorneys' fees incurred by Plaintiff in his underlying criminal trial. Irrefutably, whether Defendant acted improperly and tampered with the jury or not, the Plaintiff was, in either event, going to face a verdict of guilty or not guilty from the jury. Accordingly, whether guilty or not, the Plaintiff would have most certainly incurred the exact same amount of attorney's fees he now seeks to recover from the Defendant as damages in the present case. Because Defendant's conduct could not have caused these damages, Defendant is entitled to dismissal.

**III.    A damages award compensating Plaintiff for the cost of his underlying criminal trial would not be tailored to the interests protected by the Sixth Amendment right to an impartial jury.**

The integrity of, and public confidence in, our criminal justice system is derived directly from the concept of fairness, as "justice must satisfy the appearance of justice." *Offutt v. United States*, 348 U.S. 11, 14 (1954). The interest in fairness is reflected in the broader dual aim of America's criminal justice system: "that guilt shall not escape or innocence suffer." *Berger*, 295 U.S. at 88. This interest in fairness is achieved and protected, in part, by both the Sixth Amendment right to an impartial jury. The Sixth Amendment, applied to the States through the Due Process Clause of the Fourteenth Amendment, guarantees state criminal defendants a speedy, public trial by an impartial jury. *Cone v. Bell*, 556 U.S. 449, 451 (2009). The "most priceless" safeguard in preserving the "concepts of individual liberty and the dignity and worth of every" person is the right to a jury trial, which "guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd*, 366 U.S. 717, 721-22 (1961); *see In re Murchison*, 349 U.S. 133, 136 (1955) ("A fair trial in a fair tribunal is a basic requirement of due process."). A jury's impartiality is demonstrated by its capability and willingness to determine the factual question of

16

guilt or innocence "solely upon the evidence before it." *Smith v. Phillips*, 455 U.S. 209, 217 (1982); *Irvin*, 366 U.S. at 722 (explaining because "only the jury can strip a man of his liberty or his life . . . a juror must be as 'indifferent as he stands unsworn,'" and the "verdict must be based upon the evidence developed at trial . . . regardless of the heinousness of the crime charged, the apparent guilt of the offender or the station in life which he occupies." (internal citations omitted)).

"Impartiality is not a technical conception. It is a state of mind. For the ascertainment of this mental attitude of appropriate indifference, the Constitution lays down no particular tests and procedure is not chained to any ancient and artificial formula." *United States v. Wood*, 299 U.S. 123, 145-46 (1936). There are several constitutional rules governing the procedure of criminal trials which aim to ensure the integrity and impartiality of the jury's verdict, including *voir dire*, continuances, and protective instructions from the trial judge. *Rose v. Clark*, 478 U.S. 570, 579 (1986); *see In re Murchison*, 349 U.S. at 136 ("Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness."). "The[se] safeguards of juror impartiality," however, "are not infallible; it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote." *Smith*, 455 U.S. at 217; *Irvin*, 366 U.S. at 723 ("To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard.").

To be clear, however, "the Constitution entitles a criminal defendant to a fair trial, not a perfect one." *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986). Indeed, over a century ago, Chief Justice Waite clarified that not all impressions, opinions, or biases raise the presumption of partiality. *Reynolds v. United States*, 98 U.S. 145, 155 (1878) ("The theory of the law is that a juror

17

who has formed an opinion cannot be impartial. Every opinion which he may entertain need not necessarily have that effect."). The Supreme Court has more recently explained that the constitutional right to a fair trial is not automatically violated where there has been some extrajudicial conversation:

> [D]ue process does not require a new trial every time a juror has been placed in a potentially compromising situation. Were that the rule, few trials would be constitutionally acceptable . . . . Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen.

*Smith*, 455 U.S. at 217 (1982); *see Irvin*, 366 U.S. at 723 ("It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court."); *cf. South Carolina v. Murdaugh*, Op. No. 28329 (S.C. May 13, 2026) ("[N]ot all comments by officers of the court are prejudicial.").

The harmless-error doctrine is calculated to secure the interest of fairness through deterrence of prejudicial conduct by a third-party which threatens the integrity of a jury's fact-finding process and verdict. *Van Arsdall*, 475 U.S. at 681. Where juror partiality is alleged, the Supreme Court has long held the appropriate remedy is a hearing in which the criminal defendant can prove actual bias. *Smith v. Phillips*, 455 U.S. 209, 215 (1982). In the context of allegations of "private communications with a juror during a trial about the matter pending before the jury," this evidentiary hearing is commonly referred to as a *Remmer* hearing, after the Supreme Court's decision in *Remmer v. United States*, 347 U.S. 227 (1954).

Under *Remmer*, the reviewing court must analyze the nature of the alleged extrajudicial comments to determine whether they were "of such a character as to reasonably draw into question the integrity of the verdict," *Barnes v. Joyner*, 751 F.3d 229, 244 (4th Cir. 2014) (citations omitted), and if so, whether the "contact with the juror was harmless to the defendant." *Remmer*,

347 U.S. at 229. After a hearing to "determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial," the court may grant a new trial. *Remmer*, 347 U.S. at 230. Therefore, a *Remmer* hearing, like the harmless-error doctrine, protects the interest in fairness by analyzing the prejudicial nature of the conduct and whether the alleged extrajudicial comments jeopardized the integrity of the verdict.

Accordingly, the Sixth Amendment's is not automatically violated where there has been a constitutional error. *Van Arsdall*, 475 U.S. at 681 (explaining constitutional errors may be harmless "in terms of their effect on the fact finding process at trial."); *see Chapman v. California*, 386 U.S. 18, 24 (1967) (holding a constitutional error is harmless if, beyond a reasonable doubt, it "did not contribute to the verdict obtained."); *Holmes v. United States*, 284 F.2d 716, 718 (4th Cir. 1960) (applying the harmless-error analysis where "[t]here was the private communication of the court official to members of the jury."). This is because the Sixth Amendment does not aim to eliminate the potential of any constitutional error. *Rose*, 478 U.S. at 579 (clarifying "that errors of constitutional dimension" do not "necessarily require the reversal of criminal convictions" because "[t]he thrust of" these rules "is to ensure that those trials lead to fair and correct judgments."). Instead, the Sixth Amendment's impartial jury clause aims to protect, and the harmless-error doctrine and *Remmer* hearing/analysis are calculated to safeguard, the "integrity of the verdict," *Barnes*, 751 F.3d at 244, i.e. that the jury determined the factual question of guilt or innocence "based upon the evidence developed at trial," *Irvin*, 366 U.S. at 722, which "promotes public respect for the criminal process" and speaks to "the underlying fairness of the trial." *Van Arsdall*, 475 U.S. at 681.

In the instant matter, no Sixth Amendment interest would be furthered by allowing Plaintiff to reap financial benefit in addition to being afforded a new trial. A partial jury undermines the

integrity of the verdict by poisoning the sanctity of the evidentiary process with outside influence and bias, thus betraying the People's faith in the fairness of the criminal justice system. To ensure the integrity of the verdict, the remedy for an impartial jury is a new trial – not an acquittal. This is because the evil of a partial jury is not that it injures the petitioner, but rather that it taints the legitimacy of the verdict, which impacts both parties in the adversarial process equally and betrays the public's confidence in our criminal justice system. *See South Carolina v. Murdaugh*, Op. No. 28329, at 2 (S.C. May 13, 2026) (commenting "**Both** the State and Murdaugh's defense skillfully presented their cases to the jury . . . [h]owever, **their** efforts were in vain because . . . [the] right to a fair trial by an impartial jury" was denied (emphasis added)).

Plaintiff acknowledges in his Complaint that he was awarded the proper remedy of a new trial as the result of a *Remmer* and harmless-error analysis, in furtherance of the interests protected by the Sixth Amendment through the Fourteenth. This remedy wholly compensates Plaintiff for any alleged constitutional violation of his right to an impartial jury, as the very purpose of granting a new trial is to protect the interest of fairness by ensuring the integrity of the jury's verdict. The policy justifications undergirding *Remmer*, the harmless-error doctrine, and the Sixth Amendment would not be served by letting Plaintiff continue to benefit from these doctrines "in his § 1983 suit and be relieved of defense costs from a prosecution," trial, and double life sentence which was vacated solely because of these very doctrines. *Hector*, 235 F.3d at 158. Indeed, no Sixth Amendment value would be served by allowing Plaintiff to reap financial benefit on top of already reaping "an enormous benefit by reason of the" alleged partiality "to which he was subjected:" a new trial, achieved by alleged violation of the Sixth Amendment right. *Townes*, 176 F.3d at 148. Without a new trial, Plaintiff's two life sentences without parole would still stand. That benefit to Plaintiff, while enormous, is merely incidental to the purpose of said remedy, which is to uphold

20

the integrity of, and public respect for, our criminal justice system through ensuring verdicts are derived from evidence and law as opposed to undue bias, prejudice, or influence.

Accordingly, Defendant respectfully requests this Court dismiss Plaintiff's Complaint pursuant to Fed. R. Civ. P. 12(b)(6) because awarding damages to compensate Plaintiff for the cost of defending his underlying criminal trial would not further the interests protected by the Sixth Amendment right to trial by an impartial jury.

### IV. Plaintiff cannot recover damages for the legal defense fees incurred in connection with his underlying state criminal trial under § 1988.

Plaintiff additionally seeks to recover attorney's fees and costs under 42 U.S.C. § 1988. ECF No. 1 at 16. § 1988 provides "in any action or proceeding to enforce a provision of sections 1977, 1977A, 1978, 1979, 1980, and 1981 of the Revised Statutes [42 USCS §§ 1981–1983, 1985, 1986] . . . the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of the costs." The plain language of § 1988, therefore, expressly applies to civil suits brought under § 1983; it does not apply to criminal actions. To the extent Plaintiff alternatively attempts to recover the $600,000.00 spent on his criminal trial defense as fees and costs under § 1988, Defendant submits these damages are not recoverable.

The Fourth Circuit has never directly addressed the question of whether § 1988 empowers courts with the discretion to award the prevailing party in a § 1983 action the attorneys' fees incurred in defending the underlying criminal proceeding. While there is no consensus among the circuits on the issue, most circuits have held § 1988 applies only to attorneys' fees incurred in the civil § 1983 action, not those expenses related to the underlying criminal action. Compare *Venuti v. Riordan*, 702 F.2d 6, 9 (1st Cir. 1983) (finding no merit in § 1983 plaintiff's claim for expenses in defending a state criminal action because doing so would impermissibly expand the scope of § 1988), and *Greer v. Holt*, 718 F.2d 206, 207-08 (6th Cir. 1983) (declining to approve the award

21

attorneys' fees for work done in the underlying criminal trial in a § 1983 action because the damages claim fell "outside the statutory language of § 1988."), and *Lui v. Commn on Adult Entm't Establishments*, 369 F.3d 319, 328 (3d Cir. 2004) (holding "[d]efense of a State criminal prosecution is not a proceeding for which fees and costs can be awarded under § 1988."), *and Perkins v. Cross*, 728 F.2d 1099 (8th Cir. 1984) (holding, pursuant to § 1988, "no fees should be awarded for any time the lawyer spent defending" the underlying criminal charge), with *Castellano v. Fragozo*, 311 F.3d 689 (5th Cir. 2002) (affirming district court's award of attorneys' fees incurred in defending the § 1983 plaintiff's underlying state criminal action under § 1988), *reversed en banc on other grounds*, 352 F.3d 939 (5th Cir. 2003).

The Fifth Circuit's deviation from the majority's findings demands inquiry and analysis. In *Castellano*, the panel based their decision to compensate the § 1983 plaintiff's attorneys for their time spent on his underlying criminal proceeding on proximate cause principles. The panel noted that to be the "prevailing party" in plaintiff's § 1983 action for malicious prosecution, and thus capable of recovery under § 1988, plaintiff needed to first prevail in the underlying criminal action. 311 F.3d at 711. Therefore, because plaintiff's success in the underlying criminal proceeding was required to "satisfy the elements of malicious prosecution in his § 1983 action," the panel concluded these "fees were expended as a necessary prerequisite of his action to 'enforce' the protections of § 1983." 311 F.3d at 711.

In reaching this conclusion, the Fifth Circuit panel purportedly adopted the rationale of *Kerr* and *Borunda*, opining that the plaintiff's "expenditure of attorneys' fees to defend himself in his criminal trial was, *unquestionably,* a foreseeable result of defendants' actions." *Id.*; but see *Borunda*, 885 F.2d at 1389 n.4 (recognizing "[t]he plain language of § 1988 supports the[] holdings" in *Perkins* and *Greer*, which barred recovery of attorneys' fees from an underlying

22

criminal proceeding under § 1988). However, this rationale, that compensatory damages are recoverable for the direct and foreseeable consequences of the alleged constitutional violation, as well as the cases cited, deal directly with the scope of damages and proximate cause analysis under § 1983, **not** § 1988.

As such, the Fifth Circuit's departure from the majority is flawed, and Defendant urges this Court to follow the rule which has been adopted by the First, Third, Sixth, Eighth, and Ninth Circuits: the prevailing party in a § 1983 action cannot recover attorneys' fees incurred in defending the underlying criminal proceeding under § 1988. In the alternative, Defendant reincorporates her arguments regarding the lack of causation, as Plaintiff's underlying criminal proceeding was not a direct and foreseeable consequence of her alleged constitutional violation.

Accordingly, pursuant to Fed. R. Civ. P. 12(b)(6), Defendant respectfully requests this Court dismiss Plaintiff's request for damages to the extent Plaintiff attempts to recover the $600,000.00 spent on his criminal trial defense as fees and costs under § 1988.

### V.    Plaintiff's claim for compensatory damages must be dismissed for lack of subject-matter jurisdiction because he lacks Article III standing.

Article III of the U.S Constitution grants this Court the "judicial Power" to resolve "Cases" and "Controversies." U.S. Const. art. III, § 2. Pursuant to Article III, federal courts have the constitutional authority "to decide and pronounce a judgment and carry it into effect between persons and parties who bring a case before it for decision." *Muskrat v. United States*, 219 U.S. 346, 356 (1911) (quotation omitted). The "only power constitutionally assigned to the federal courts," *Wells v. Johnson*, 150 F.4th 289, 298 (4th Cir. 2025), this "judicial power exists only to redress or otherwise protect against injury to the complaining party." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). The doctrine of standing "honors the limitations inherent in this assignment by ensuring judges attend to actual harms rather than abstract grievances." *United States v. Texas*, 599

23

U.S. 670, 686 (2023) (Gorsuch, J., concurring in the judgment); *see Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) ("Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy" which "limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong.").

"The fundamentals of standing are well-known and firmly rooted in American constitutional law. To establish standing, . . . a plaintiff must demonstrate (i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024). Plaintiff cannot satisfy the "irreducible constitutional minimum" of Article III standing, and his claim for compensatory damages is subject to dismissal for lack of subject-matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1). *Spokeo*, 578 U.S. at 338

Plaintiff seeks the following remedies for Defendant's alleged actions: compensatory damages of $600,000.00, punitive damages, reasonable attorneys' fees, the costs of this action, and "such other and further relief as the Court may deem just and proper." ECF No. 1 at 16. Assuming *arguendo*, and solely for the purposes of this motion to dismiss, that Plaintiff can satisfy the first standing requirement as it relates to Plaintiff's claim for compensatory damages, Defendant submits Plaintiff's claim cannot satisfy the second prong of the standing analysis: traceability.

### A. Plaintiff cannot establish his claimed injuries are fairly traceable to Defendant's conduct.

"For an injury to be traceable, 'there must be a casual connection between the injury and the conduct complained of' by the plaintiff." *Air Evac EMS, Inc. v. Cheatham*, 910 F.3d 751, 760 (4th Cir. 2018) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). The Supreme Court has explained "the line of causation between the illegal conduct and injury—the links in the chain

of causation—must not be too speculative or too attenuated." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 383 (2024) (cleaned up) (citing *Allen v. Wright*, 468 U.S. 737, 752 (1984) and *Clapper v. Amnesty Int'l USA*, 568 U. S. 398, 420-22 (2013)). "While the defendant's conduct need not be the last link in the causal chain, the plaintiff must be able to demonstrate that the alleged harm was caused by the defendant, as opposed to the 'independent action of some third party not before the court.'" *Frank Krasner Enters., Ltd. v. Montgomery Cty.*, 401 F.3d 230, 234 (4th Cir. 2005) (quoting *Allen*, 468 U.S. at 757).

The question before this Court is whether Plaintiff can demonstrate that the expenditures for legal representation during his murder trial are attributable to the Defendant's alleged violation of Plaintiff's constitutional right to trial before an impartial jury. Defendant submits that Plaintiff cannot. Plaintiff states he spent "the entire $600,000.00 on his trial defense." See ECF No. 1 at 15. Plaintiff's Complaint omits any detail outlining when the withdrawal was made or when he began paying his attorneys; Plaintiff's attorneys, however, have publicly stated the $600,000.00 was a flat fee which was to encompass Plaintiff's entire defense. Plaintiff's expenditures for legal representation in his underlying criminal trial, a flat fee of $600,000.00, would have been incurred regardless of the alleged constitutional violation. Defendant played no role in seeking warrants for Plaintiff's arrest, presenting the matter to the Colleton County Grand Jury, the Grand Jury's indictment of Plaintiff on said charges, or the State's decision to pursue those charges to and through a jury trial: the actions which led to the initiation of Plaintiff's murder trial and expenditures for his legal defense. *Cf. Disability Rights S.C. v. McMaster*, 24 F.4th 893, 902 (4th Cir. 2022) ("When a defendant has no role in enforcing the law at issue, it follows that the plaintiff's injury allegedly caused by that law is not traceable to the defendant."). The State's prosecution and the grandy jury's indictment—independent actions by third parties not before this

Court—caused the alleged harm plaintiff is seeking compensation for: the expenses of defending his criminal trial. *Allen*, 468 U.S. at 757. Accordingly, Plaintiff's Complaint fails to demonstrate traceability for his compensable damages claim, as there is not a sufficient casual nexus between the injury and the conduct complained of. *Lujan*, 504 U.S. at 560; *Air Evac EMS*, 910 F.3d at 760.

Moreover, to the extent Plaintiff attempts to distinguish between incurring legal fees because of Defendant's alleged constitutional violation and Defendant's alleged constitutional violation causing these funds to "be[] lost," ECF No. 1 at 15, such a theory begs yet another question of causation. Plaintiff's causation theory is grounded in the assumption that Defendant's alleged jury tampering influenced certain jurors to vote guilty as opposed to not guilty, resulting in a violation of his constitutional right to an impartial jury which, in turn, led ultimately to a retrial.  Plaintiff's Complaint contends Defendant tampered with and ultimately had her excused from the jury in an effort "to obtain [Defendant's] desired guilty verdict," because Juror No. 785 "had not made up her mind" and "still had questions" as to Plaintiff's guilt or innocence. ECF No. 1 at 8-10. It was this "meddling in events," along with three (3) jurors testifying that they heard Defendant's comments, and Juror Z's testimony that Defendant affected her guilty verdict, which ultimately led to the Supreme Court's ordering of a new trial.  *South Carolina v. Murdaugh*, Op. No. 28329 (S.C. May 13, 2026).

Taking Plaintiff's allegations as true, nine jurors heard none of the Defendant's impermissible statements and based their opinions solely on the evidence before them. Even if, as Plaintiff alleges, Defendant's actions somehow improperly influenced the remaining three jurors to support of a guilty verdict, such actions would have resulted, per Plaintiff's allegations, in a mistrial at most, after which Plaintiff might, as here, be subject to having the case retried. In short, even accepting the Plaintiff's allegations as true, the loss of funds used to pay Plaintiff's legal fees

26

in his underlying criminal trial was not caused by Defendant's alleged constitutional violation – the same might as well have occurred absent any constitutionally violative conduct on the part of the Defendant.

Furthermore, if Plaintiff wishes to contend the expenditures for legal representation was not a flat fee but rather based upon a billable structure itemizing the work done by his attorneys, Plaintiff must, again, rely on a highly speculative theory of recovery. Plaintiff was indicted for the murder of his wife and son, as well as two counts of possession of a weapon during the commission of a violent crime, on July 14, 2022. ECF No. 1 at 4; *see* 2022-GS-15-00592, -00593; 2022-GS-15-00594, -00595. Plaintiff's trial began on January 23, 2023, and he was sentenced on March 3, 2023. ECF No. 1 at 4.  Plaintiff's murder trial lasted for a total of forty (40) days. Plaintiff contends Defendant's alleged constitutional violation began twenty-nine (29) days after the trial began, on February 21, 2023, and continued for eleven (11) days until Plaintiff's sentencing. ECF No. 1 at 4-9.

Therefore, to prove Defendant's alleged constitutional violation caused Plaintiff to lose $600,000 in attorneys' fees, Plaintiff must submit evidence revealing but for Defendant's actions, he would not have incurred $600,000.00 in attorneys' fees within this eleven (11) day period. In other words, Plaintiff must demonstrate but for Defendant's alleged constitutional violation, his underlying criminal trial and his attorneys' work thereon would not have continued for this eleven (11) day period. Any evidence in support of this contention would be highly speculative; guesswork grounded in prediction as opposed to firm facts. *See FDA v. All. for Hippocratic Med.*, 602 U.S. at 383 (recognizing the Supreme Court "has said that plaintiffs attempting to show causation generally cannot 'rely on speculation about the unfettered choices made by independent actors not before the courts.'" (quoting *Clapper*, 568 U. S. at 415, n.5)).

27

Finally, even if this Court were to accept this speculative theory of recovery, the relief requested within the Complaint is far beyond any actual cost of attorneys' fees incurred. At first blush, and by way of simple estimation, it facially appears that the Plaintiff could only show he incurred $165,000.00 in attorneys' fees in his underlying criminal trial even possibly related to the Defendant's alleged constitutional violation. Assuming Plaintiff's complaint is a true reflection of the attorneys' fees incurred in the underlying criminal trial, and assuming *arguendo* that his attorneys were paid only for the days upon which Plaintiff was on trial[2], Plaintiff incurred $15,000.00 in attorneys' fees on each of the forty (40) days that he was on trial.[3] Accordingly, pursuant to the Complaint, Plaintiff incurred $435,000.00 in attorneys' fees **prior to** Defendant's alleged constitutional violation[4], and $165,000.00 in attorneys' fees **after** Defendant's alleged constitutional violation.[5]

Plaintiff's asserted injury, loss of attorneys' fees in his underlying criminal case, was not caused by Defendant. Further, any potential causal connection linking the loss of attorneys' fees to Defendant's alleged constitutional violation is simply too speculative, too attenuated, and too weak to support Article III standing: the damages alleged by the Plaintiff were not caused by the alleged constitutional violation by the Defendant. *Cf. FDA v. All. for Hippocratic Med.*, 602 U.S. at 380-81 (explaining causation and redressability are often "'flip sides of the same coin,' . . . [i]f

---

[2] While undersigned counsel submits it is safe to assume that the work for which Plaintiff's defense lawyers were being paid began well before the January 23, 2023, trial date, for the purposes of this motion to dismiss, Defendant assumes *arguendo* the date of first payment was January 23, 2023. Defendant only makes this assumption at the current stage of the proceeding because the discovery process has not yet developed. Defendant will, of course, update the accuracy of these calculations upon Plaintiff's provision of evidence demonstrating the date upon which payment began, the total amount of fees received, and the itemized costs for which the funds accounted for.

[3] $600,000 \div 40 = 15,000$.

[4] $15,000 \times 29 = 435,000$.

[5] $15,000 \times 11 = 165,000$.

a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress the injury."); *see Wells v. Johnson*, 150 F.4th 289, 299 (4th Cir. 2025) (explaining plaintiffs must "show standing, within each claim, to seek each remedy they ask for.").

Accordingly, Defendant respectfully requests for this Court to dismiss Plaintiff's claim of compensatory damages for lack of subject-matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1).[6]

VI.    **The doctrine of ripeness bars present resolution of any potential claim for compensatory damages resulting from Defendant's alleged constitutional violation.**

Accordingly, and as argued *supra*, Plaintiff has failed to state a compensable claim under 42 U.S.C. § 1983 – the theory of damages alleged by the Plaintiff have been largely rejected by United States Courts of Appeals, and, even had they not, were not caused by the Defendant's actions; however, to the extent, if any, that this Court is willing to construe Plaintiff's Complaint as alleging that his damages stem not from his first trial but, instead, from his upcoming retrial, such a claim is not yet ripe. "'Like standing, the ripeness doctrine 'originates in the case or controversy constraint of Article III.'" *South Carolina v. United States*, 912 F.3d 720, 730 (4th Cir. 2019), *cert. denied*, 400 U.S. 833 (1970) (quoting *Scoggins v. Lee's Crossing Homeowners Ass'n*, 718 F.3d 262, 269 (4th Cir. 2013) (quotation marks and citations omitted)). This "justiciability doctrine determines when a case or controversy is fit for federal judicial review," *Trustgard Ins.*

---

[6] Plaintiff does not request nominal damages. *See Uzuegbunam v. Preczewski*, 592 U.S. 279, 289-92 (2021) (holding "a request for nominal damages satisfies the redressability element of standing where a plaintiff's claim is based on a completed violation of a legal right" because common law recognized "that a party whose rights are invaded can also recover nominal damages without furnishing any evidence of actual damage."). Nor does Plaintiff's "boilerplate request for other and further relief as the Court deems just and proper . . . preserve a nominal damages claim when there is absolutely no specific mention in the Complaint of nominal damages." *Foodbuy, LLC v. Gregory Packaging, Inc.*, 987 F.3d 102, 116 (4th Cir. 2021). Finally, the prospect of attorney's fees and costs cannot confer standing or prevent mootness throughout. *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 480 (1990).

*Co. v. Collins*, 942 F.3d 195, 199 (4th Cir. 2019), and "prevents judicial consideration of issues until a controversy is presented in 'clean-cut and concrete form.'" *Miller v. Brown*, 462 F.3d 312, 318-19 (4th Cir. 2006) (quoting *Rescue Army v. Mun. Court of L.A.*, 331 U.S. 549, 584 (1947)). As such, ripeness is a question of subject matter jurisdiction. *See Sansotta v. Town of Nags Head*, 724 F.3d 533, 548 (4th Cir. 2013) (citation omitted). "A case is fit for adjudication when the action in controversy is final and not dependent on future uncertainties; conversely, a claim is not ripe when it rests upon contingent future events that may not occur as anticipated." *In re Naranjo*, 768 F.3d 332, 347 (4th Cir. 2014) (internal quotation marks omitted).

Plaintiff does not contend Defendant's alleged jury tampering caused a retrial for which Plaintiff has to incur additional legal costs; but, in essence, Plaintiff brings this action under a fallacious theory of recovery to preemptively secure funds for his upcoming retrial. While such a retrial may arguably be the result of Defendant's alleged constitutional violation, any claim for compensatory damages based thereupon is not ripe. Plaintiff has not yet suffered any damages because of Defendant's alleged constitutional violation, as the potential retrial has not taken place, and therefore any potential legals costs to defend said retrial have not been incurred. *See Beatley v. Ayers*, 851 F. App'x 332, 337 (4th Cir. 2021). Indeed, any resolution of such claim would be rest "'upon contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Scoggins*, 718 F.3d at 270 (4th Cir. 2013) (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)). As such, the Constitution demands that judicial review is withheld if and until Plaintiff's alleged injury, his retrial and the attorneys' fees incurred therefor, moves "from the speculative to the concrete." *South Carolina v. United States*, 912 F.3d at 731.

Accordingly, Defendant respectfully requests for this Court to dismiss Plaintiff's claim of compensatory damages for lack of subject-matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1).

30

## VII. Defendant is entitled to immunity under the Eleventh Amendment and under the doctrines of judicial immunity and qualified immunity.

As argued, *supra*, Plaintiff's Complaint is subject to dismissal pursuant to Rules 12(b)(6) and 12(b)(1) of the Federal Rules of Civil Procedure; however to the extent, if any, that this Court finds that Plaintiff's Complaint is not subject to dismissal based on his failure to state a claim and lack of standing, Defendant would nonetheless be entitled to such dismissal based on her immunity under the Eleventh Amendment, under the doctrine of judicial immunity, and under the doctrine of qualified immunity. These immunities are properly raised in a Rule 12 motion, where the Supreme Court has held that such immunities are immunities from suit, rather than mere defenses to liability; such immunities are "effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Here, Defendant is entitled to immunity under the Eleventh Amendment; Plaintiff alleges that Defendant is a constitutional officer of the State of South Carolina, elected as the Clerk of Court by the citizens of Colleton County, and that the actions taken by Defendant were taken within her official role. Similarly, Defendant is entitled to quasi-judicial immunity, where the actions complained of by the Plaintiff were judicial in nature and related directly to the Defendant's judicial responsibilities. Finally, Defendant is entitled to qualified immunity, where it was not clearly established at the time of the alleged constitutional violations that the Defendants actions violated the Plaintiff's rights under the Sixth Amendment. As Plaintiff alleges in his Complaint, former Chief Justice Jean Toal denied Plaintiff's motion for a new trial, finding that Defendant's conduct amounted to harmless error. The South Carolina Supreme Court reversed the decision, acknowledging throughout its Opinion the difficulty, the complexity, and the conflicting jurisprudence of the Sixth Amendment inquiry. The violative nature of Defendant's conduct, then, was neither readily apparent nor obvious to former Chief

31

Justice Toal nor to the South Carolina Supreme Court – it could but have been wholly lost on Defendant or any other reasonable Clerk of Court.

### A. Defendant is entitled to immunity under the Eleventh Amendment.

The Eleventh Amendment to the Constitution of the United States of America establishes that "the Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State." U.S. Const. amend. XI. This withdrawal of jurisdiction effectively confers an immunity from suit. *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 144 (1993). The Supreme Court "has consistently held that an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State." *Edelman v. Jordan*, 415 U.S. 651, 662-663 (1974). Absent waiver, neither a State nor agencies acting under its control may "be subject to suit in federal court." *Welch v. Texas Dept. of Highways and Public Transportation*, 483 U.S. 468, 480 (1987) (plurality opinion); see also *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 66 (1989); *Cory v. White*, 457 U.S. 85, 90-91 (1982); *Alabama v. Pugh*, 438 U.S. 781 (1978) (per curiam); *Mt. Healthy City Bd. of Ed. v. Doyle*, 429 U.S. 274, 280 (1977). Further, Eleventh Amendment immunity "extends to 'arm[s] of the State,' including state agencies and state officers acting in their official capacity," *Cromer v. Brown*, 88 F.3d 1315, 1332 (4th Cir. 1996) (alteration in original) (internal citations omitted), because "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office . . . [and] is no different from a suit against the State itself." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) (internal citation omitted). Therefore, Eleventh Amendment immunity protects state agencies and state officials sued in their official capacity from liability for monetary damages under 42 U.S.C. § 1983. *Id*. The South Carolina Tort Claims Act expressly

32

provides that the State of South Carolina does not waive Eleventh Amendment immunity, and consents to suit only in a court of the State of South Carolina. S.C. Code Ann. § 15-78-20(e).

As Plaintiff notes in his Complaint, Defendant was at all relevant times acting as the Clerk of Court for the Circuit Court of Colleton County, South Carolina, a position to which she was elected pursuant to Article V, § 24 of the South Carolina Constitution. The Colleton County Clerk of Court's Office is funded by the state of South Carolina. Unquestionably, Defendant, then, is being sued as an arm of the state; she has neither waived the protections of the Eleventh Amendment nor consented to suit in federal court. Accordingly, she is entitled to Eleventh Amendment immunity.

### B.  Defendant is entitled to quasi-judicial immunity.

Defendant is likewise entitled to quasi-judicial immunity for all acts alleged in Plaintiff's Complaint. "The absolute immunity from suit for alleged deprivation of rights enjoyed by judges is matchless in its protection of judicial power. It shields judges even against allegations of malice or corruption." *McCray v. Maryland*, 456 F.2d 1, 3  (1972) (citing *Pierson v. Ray*, 386 U.S. 547, 554-555 (1967)). "'[Q]uasi-judicial' . . . officials whose duties are comparable to those of judges or prosecutors" are likewise entitled to absolute immunity. *Ostrzenski v. Seigel*, 177 F.3d 245, 249 (4th Cir. 1999); see *Goldstein v. Moatz*, 364 F.3d 205, 213 (4th Cir. 2004). And such immunity extends to the judge's subordinates for "functions that are more administrative in character [that] have been undertaken pursuant to the [judge's] explicit direction." *Kincaid v. Vail*, 969 F.2d 594, 601 (7th Cir. 1992).

Accordingly, "clerks of court are generally afforded quasi-judicial immunity from suit on claims involving 'tasks so integral or intertwined with the judicial process that these persons are considered an arm of the judicial officer who is immune.'" *Hamilton v. United States, D.O.J.*, C/A

33

No. 2:20-cv-1666-RMG-MHC, 2020 U.S. Dist. LEXIS 186872, 2020 WL 7001153, at *6 (D.S.C. Aug. 26, 2020) (citation omitted), *R&R adopted by* 2020 U.S. Dist. LEXIS 185719, 2020 WL 5939235 (D.S.C. Oct. 7, 2020), *aff'd*, 848 F. App'x 564 (4th Cir. 2021); see also *Martin v. Rush*, C/A No. 13-cv-693, 2013 U.S. Dist. LEXIS 72964, 2013 WL 2285948, at * 5 (D.S.C. 2013) (applying quasi-judicial immunity to clerk who allegedly failed to provide the plaintiff with a hearing transcript despite his request); *Robinson v. McBride*, C/A No. 13-cv-352, 2013 U.S. Dist. LEXIS 71134, 2013 WL 2099491, at * 4 (D.S.C. 2013) (applying quasi-judicial immunity to clerk who allegedly failed to properly process the plaintiff's notice of appeal), *R&R adopted by* 2013 U.S. Dist. LEXIS 68376, 2013 WL 2099707 (D.S.C. May 14, 2013), *aff'd*, 540 F. App'x 212 (4th Cir. 2013); *Wiley v. Buncombe County*, 846 F. Supp. 2d 480, 485 (W.D.N.C. 2012) (finding quasi-judicial immunity applied to clerk who allegedly failed to deliver judge's writ of habeas corpus to the appropriate parties). As with Eleventh Amendment immunity and qualified immunity, such quasi-judicial immunity is designed not only to protect defendants from liability, but also from the burdens of litigation. *Mitchell*, 472 U.S. at 526-27.

Under the facts alleged by Plaintiff, Defendant is entitled to quasi-judicial immunity. Plaintiff's Complaint characterizes Defendant as "the officer of the court charged as the primary caretaker of the jury." ECF No. 1 at 2. Some contact between the Defendant and the jury was not merely inevitable, but an explicit and acknowledged function of Defendant's role as the Clerk of Court. Whatever the nature and alleged illegality of the contacts between Defendant and the jury in the Plaintiff's underlying criminal trial, it is undisputed that her contact with and caretaking of the jury was integral to the judicial process and that the same were conducted within the context of Defendant's role as the Colleton County Clerk of Court.

Accordingly, Defendant is entitled to quasi-judicial immunity.

34

### C. Defendant is entitled to qualified immunity.

Even could Plaintiff show that he suffered some Constitutional deprivation, Defendant is nonetheless entitled to qualified immunity. In *Harlow v. Fitzgerald*, 457 U.S. 800 (1982), the Supreme Court held that government officials are shielded from liability in civil actions if their conduct does not violate clearly established statutory rights of which a reasonable person would have known. The standard created in *Harlow* is an objective standard and is based upon the state of the law at the time of the alleged violation. The purpose of qualified immunity defense is to enable governmental officials to carry out their jobs free from the fear of civil liability for every mistake they may make, and to protect them from the "expenses of litigation, the diversion of official energy from pressing public issues and the deterrence of able citizens from acceptance of public office." *Harlow*, 457 U.S. at 814. That Court emphasized that:

> [G]overnment officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Reliance on the objective reasonableness of an official's conduct, as measured by reference to clearly established law, should avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment.

*Id*. at 818.

Additionally, qualified immunity "provides ample protection to all but the plainly incompetent and those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1985). In *Anderson v. Creighton*, 483 U.S. 635, 640 (1987), the Supreme Court explained that in evaluating the defense of qualified immunity:

> The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates the right. That is not to say an official action is protected by qualified immunity unless the very action questioned has previously been held unlawful; but it is to say that in light of pre-existing law, the unlawfulness must be apparent. (Internal citations omitted).

*Id*. see also *Dimeglio v. Haines*, 45 F.3d 790 (4th Cir. 1995).

35

The Fourth Circuit Court of Appeals has also explained the rationale for the qualified immunity doctrine as set forth in *Harlow* as follows:

> The grant of qualified immunity to government officials ensures that these officials can perform their duties from the specter of endless and debilitating lawsuits. Without such an immunity, the operations of government would be immobilized. Permitting damages suits against government officials can entail substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties.

*Torchinsky v. Siwinsky*, 942 F.2d 257, 260-261 (4th Cir. 1991).

Granting a Defendant's motion for summary judgment is particularly appropriate in cases involving a qualified immunity defense, as the defense exists not merely to protect governmental officials from liability, but to protect them from trial. *Mitchell* 472 U.S. 511; *Turner v. Dammon*, 848 F.2d 440 (4th Cir. 1988). The Fourth Circuit has strongly espoused a preference for resolving civil rights cases involving qualified immunity short of trial, if possible. *Turner*, 848 F.2d at 444 (4th Cir. 1988). The Court in *Turner* also noted that qualified immunity entitles a defendant to dismissal unless there is an issue as to whether the defendant in fact committed a violation of a clearly established law. *Id*. at 443.

Therefore, to determine whether a defendant is entitled to qualified immunity in this case, the Court must make three determinations. First, the Court must identify the specific right allegedly violated by the Defendant. Second, the Court must determine whether, at the time of the alleged violation, these rights were clearly established. Finally, the Court must determine whether a reasonable person in the defendant's position would have known that his actions were in violation of another person's rights. *Pritchett v. Alford*, 973 F.2d 307, 312 (4th Cir. 1992).

> The first two of these present pure questions of law for the courts. The third, which involves application of *Harlow*'s objective test to the particular conduct at issue, may require factual determinations respecting disputed aspects of that conduct.

36

> In determining whether the specific right allegedly violated was clearly established, the proper focus is not upon the right at its most general or abstract level, but at the level of its application to the specific conduct being challenged. And the determination whether a reasonable person in the officer's position would have known that his conduct would violate the right at issue must be made on the basis of information actually possessed by the officer at the critical time, or that was then reasonably available to him, and in light of any exigencies of time and circumstance that reasonably may have affected the officer's perceptions. The tolerance thus accorded by the qualified immunity defense to good faith mistakes of judgment traceable to unsettled law, or faulty information, or contextual exigencies, is deliberately designed to give protection to all but the plainly incompetent or those who knowingly violate the law, in order to avoid undue inhibitions in the performance of official duties. (internal citations omitted).

*Pritchett*, 973 F.2d at 312-13.

In determining the right allegedly violated, "a court evaluating a claim of qualified immunity must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all." *Wilson v. Layne*, 526 U.S. 603, 609 (1999). Deciding this first issue can save a defendant from having "to engage in the expensive and time-consuming preparation to defend the suit on its merits." *Siegert v. Gilley*, 500 U.S. 226, 232 (1991). It "also promotes clarity in the legal standards for official conduct, to the benefit of both the officers and the general public." *Wilson*, 526 U.S. at 609 (citing *County of Sacramento v. Lewis*, 523 U.S. 833, 840-42 n.5, 140 L.Ed. 2d 1043, 118 S. Ct. 1708 (1998)).

"A right is clearly established when it is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021). "A right is clearly established when it is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Rivas-Villegas*, 595 U.S. at 5.

> To find that a right is clearly established, courts generally "need to identify a case where an officer acting under similar circumstances . . . was held to have violated" the Constitution. *Escondido v. Emmons*, 586 U. S. 38, 43, 139 S. Ct. 500, 202 L. Ed. 2d 455 (2019) (*per curiam*) (internal quotation marks omitted). The relevant

37

precedent must define the right with a "high degree of specificity," so that "every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *District of Columbia v. Wesby*, 583 U. S. 48, 63, 138 S. Ct. 577, 199 L. Ed. 2d 453 (2018) (internal quotation marks omitted).

*Zorn v. Linton*, 146 S. Ct. 926, 930 (2026).

In his Final Reply Brief in his appeal before the South Carolina Supreme Court, Plaintiff acknowledged that, "[t]he facts of this case are admittedly novel. To undersigned counsel's knowledge, this has never happened before."[7] Plaintiff, then, in order to overcome Defendant's plea of qualified immunity, must show that, at the times alleged in Plaintiff's Complaint, it was clearly established that a reasonable person in Defendant's position would have known that her conduct rose above the level of harmless error and constituted a Sixth Amendment violation. As the Supreme Court noted in *Smith v. Phillips*:

> [D]ue process does not require a new trial every time a juror has been placed in a potentially compromising situation. Were that the rule, few trials would be constitutionally acceptable. The safeguards of juror impartiality, such as voir dire and protective instructions from the trial judge, are not infallible; it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote.

455 U.S. at 217 (1982).

Accordingly, the Sixth Amendment's is not automatically violated where there has been a constitutional error. *Van Arsdall*, 475 U.S. at 681 (explaining constitutional errors may be harmless "in terms of their effect on the fact finding process at trial."); *see Chapman v. California*, 386 U.S. 18, 24 (1967) (holding a constitutional error is harmless if, beyond a reasonable doubt, it "did not contribute to the verdict obtained."); *Holmes v. United States*, 284 F.2d 716, 718 (4th Cir. 1960) (applying the harmless-error analysis where "[t]here was the private communication of the court

---

[7] *Colonial Penn Ins. Co. v. Coil*, 887 F.2d 1236, 1239 (4th Cir. 1989) ("We note that 'the most frequent use of judicial notice is in noticing the content of court records.'").

official to members of the jury."). This is because the Sixth Amendment does not aim to eliminate the potential of any constitutional error. *Rose*, 478 U.S. at 579 (clarifying "that errors of constitutional dimension" do not "necessarily require the reversal of criminal convictions" because "[t]he thrust of" these rules "is to ensure that those trials lead to fair and correct judgments."). The Fourth Circuit has further recognized the limited precedent on both "jury bias arising from third-party contact during the course of a trial," *Barnes v. Joyner*, 751 F.3d 229, 257 (4th Cir. 2014), and "external influences depriving defendants of the rights to an impartial jury." *Daugherty v. Dingus*, 171 F.4th 326, 331 (4th Cir. 2026) (affirming the district court's judgment because clearly established federal law "governing extrinsic jury influence did not extend to cover statements of this sort."). The Supreme Court has only considered these issues in "a handful of cases." *Id*.

In *Parker v. Gladden*, the Supreme Court found a *habeas corpus* petitioner was deprived of his rights of confrontation and cross-examination under the Sixth Amendment, made applicable to the States through the Due Process Clause of the Fourteenth Amendment, by way of a bailiff's comments to, and in the presence of, certain jurors during petitioner's second-degree murder trial. The court bailiff, who was assigned to shepherd the sequestered jury, made two statements to two separate jurors while in the presence of others: "'Oh that wicked fellow [petitioner], he is guilty'"; and "'if there is anything wrong [in finding petitioner guilty] the Supreme Court will correct it.'" *Parker v. Gladden*, 385 U.S. 363 - 65 (1966). The State, arguing the case for respondent, contended no prejudice had been shown. 385 U.S. at 365. The Supreme Court dismissed this argument, finding that it overlooked the bailiff's actions, "as an officer of the court as well as the State beyond question carries great weight with a jury." *Id*. (cleaned up). The Supreme Court further highlighted the jury's twenty-six (26) hour deliberation, which, in their eyes, indicated "a difference among them as to the guilt of petitioner[,]" as well as one of the juror's testimony that she was prejudiced

39

by the bailiff's statements. *Id*. Aside from these findings, the Supreme Court held "'that the unauthorized conduct of the bailiff involves such a probability that prejudice will result that it is deemed inherently lacking in due process,'" *Id*. (citing *Estes v. Texas*, 381 U.S. 532, 542-543 (1965)), and "'it would be blinking reality not to recognize the extreme prejudice inherent' in such statements that reached at least three members of the jury and one alternate member." *Id*. (citing *Turner v. Louisiana*, 379 U.S. 466, 473 (1965)). The State further contended that no harm could have resulted, "because 10 members of the jury testified that they had not heard the bailiff's statements[,] and [] Oregon law permits a verdict of guilty by 10 affirmative votes." 385 U.S. at 365. The Supreme Court rejected this argument as well, holding "petitioner was entitled to be tried by 12, not 9 or even 10, impartial and unprejudiced jurors." *Id*. at 366. Ultimately, the Supreme Court reversed the Supreme Court of Oregon, which had held the comment did not deprive petitioner of a fundamentally fair trial, because the bailiff's comments abridged petitioner's rights of confrontation and cross-examination under the Sixth Amendment, which "are fundamental requirements of a constitutionally fair trial." *Id*. at 365 (citing *Kirby v. United States*, 174 U.S. 47, 55-56 (1899); *In re Oliver*, 333 U.S. 257, 273 (1948); *Pointer v. Texas*, 380 U.S. 400 (1965)).

The South Carolina Court of Appeals has likewise reversed a conviction where a bailiff's response to the forelady, that they should not worry if they were deadlocked because the judge was fair, was misleading. It tended to lessen the jury's sense of responsibility by implying that if they rendered a verdict of guilty without mercy, the judge had some discretion in sentencing. *State v. Cameron*, 311 S.C. 204, 208 (Ct. App. 1993). But again, the mere fact that some conversation occurred between a juror and a court official would not necessarily prejudice a defendant. *State v. Goodwin*, 250 S.C. 403, 405 (1967). In *State v. Green*, the South Carolina Court of Appeals held that, while improper, a bailiff informing a juror that, in the event of deadlock, the judge would

40

likely issue an *Allen* charge and ask the jury whether they could stay later failed to rise to the level of a Sixth Amendment violation where there was no reasonable possibility the comments influenced the verdict. *State v. Green*, 427 S.C. 223, 236 (Ct. App. 2019). In *State v. Rowell*, the South Carolina Supreme Court dealt with extrajudicial communications between a bailiff and jury member. 75 S.C. 494, 56 S.E. 23 (1906). There, a juror submitted an affidavit disclosing that "during the trial of the case, a bailiff of the Court talked about the case in his presence[] and said that the defendant should be punished." *Rowell*, 75 S.C. at 511. The S.C. Supreme Court found it may be that "the Court should have punished this bailiff for his conduct, and that . . . the juror[] should have informed the Court of the bailiff's conduct," the extrajudicial communication with a member the jury did not warrant a new trial, as there was no evidence that the verdict was influenced by the bailiff's comments. *Id*. The S.C. Supreme Court further commented that individuals "who are selected to serve as jurors must be considered to have personal firmness and conviction, and not to be presumed to bend to every wind of opinion that blows around their ears." *Id*.

Certainly Defendant Hill's comments as alleged by the Plaintiff were less innocuous than the Bailiff's comments in *Green*, which, though inappropriate, related strictly to the administration of the trial. But, just as certainly, they fell short of the comments at issue in *Parker*, *Cameron*, and *Rowell*. Like in *Parker*, three jurors here heard the statements made by Defendant, and one juror testified that she was prejudiced by the statements. The prejudiced juror in *Parker* testified that bailiff's statements, "all in all[,] it must have influenced me. I didn't realize it at the time." 385 U.S. at 365. The *Parker* juror denied any impermissibly influence when she was first examined and later admitted that, because "she was extremely upset by the verdict[,]" she "would do anything short of committing perjury to overturn it." 385 U.S. 369, n.3 (Harlan, J., dissenting).

Furthermore, "[i]n specifying that the bailiff's remarks 'must' have influenced her she limited herself to declaring that they did so in connection with the pressure put on her by other jurors during the deliberations thus stating that 'all in all' she 'must' have been influenced." *Id*.

Similarly, in the case *sub judice*, the prejudiced juror ("Juror Z") first testified that her verdict was based entirely upon testimony, evidence, and law presented in the case. ECF No. 1 at p. 11. Juror Z subsequently testified, however, "that her verdict was influenced by communication by Clerk Hill, and that she felt Clerk Hill thought the defendant was guilty." *Id*. The prejudiced juror then seemingly recanted this testimony once presented with her prior affidavit, which she testified was a more accurate statement of how she felt. The previous affidavit stated that the juror "had questions about Mr. Murdaugh's guilt but voted guilty because she felt pressured by the other jurors." Similar to Justice Harlan's dissent in *Parker*, the South Carolina Appellate Court found the evidence of prejudice was trivial and could not be delineated from the internal deliberative pressure from the other jurors.

Unlike the *Parker* jury, which deliberated for twenty-six (26) hours after sitting for eight (8) days, the jury in *South Carolina v. Murdaugh* took less than four (4) hours to reach a guilty verdict after the six (6) week trial. Further, the bailiff in *Parker* directly commented on the ultimate issue of the case: "'Oh that wicked fellow . . . is guilty.'" 385 U.S. at 363. The *Parker* bailiff also suggested the Oregon Supreme Court would ensure the petitioner would be found guilty, regardless of any deficiencies: "'if there is anything wrong [in finding petitioner guilty] the Supreme Court will correct it.'" 385 U.S. at 364. The Defendant here, however, made no such comments concerning Plaintiff's guilt or innocence. Defendant Hill's comments that the day in which Plaintiff testified was "epic" or "important" do not deal with the ultimate issue. Nor did Defendant Hill suggest to the jury that the outcome of the *Murdaugh* trial was certain.

The only similarities between the bailiff's comments in *Parker* and Defendant Hill's in here is that the comments could be construed as attacking the petitioner's/Plaintiff's credibility. The Parker bailiff called the petitioner a "wicked fellow," and Defendant Hill told jurors not to be "fooled, confused, thrown off, or convinced" by Plaintiff's or his lawyers' arguments and to watch his body language closely.

The South Carolina Appellate Court found these comments had no effect on the verdict of any juror, while the South Carolina Supreme Court held these statements were more than innocuous interventions. Upon presentation of these facts, astute analysis, and diligent research, the former Chief Justice of the Supreme Court of South Carolina found Defendant's actions did not rise to the level of a constitutional violation. This "is to say that in light of pre-existing law, the unlawfulness" was not apparent to a highly esteemed judge with decades of judicial experience. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); see also *Dimeglio v. Haines*, 45 F.3d 790 (4th Cir. 1995)). Just as Chief Justice Toal is certainly not "plainly incompetent," Defendant Hill did not "knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1985). Accordingly, Defendant Hill is entitled to the ample protection afforded under the doctrine of qualified immunity.

## CONCLUSION

For the foregoing reasons, Defendant prays for an Order dismissing Plaintiff's claim.

*(Signature page to follow)*

43

Respectfully Submitted,


 *s/Charles F. Turner, Jr.*
Charles F. Turner, Jr. (Fed. I.D. # 05849)
G. Troy Thames (Fed. I.D. #07713)
J. Nathan Ozmint (Fed. I.D. #14360)
Bowman H. Taylor (Fed. I.D. #14690)
WILLSON JONES CARTER & BAXLEY, P.A.
325 Rocky Slope Road, Suite 201
Greenville, SC  29607
Telephone: (864) 672-3711
Facsimile: (864) 373-7055
Email: cfturner@wjcblaw.com
        tthames@wjcblaw.com
        jnozmint@wjcblaw.com
        bhtaylor@wjcblaw.com
**ATTORNEYS FOR DEFENDANT**


June 18, 2026